NOTICE

Decision filed 04/10/23. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2023 IL App (5th) 170453

NO. 5-17-0453

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* COMMITMENT OF ALLEN MOORE | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | St. Clair County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 05-MR-199 |
| | ) | |
| Allen Moore, | ) | Honorable |
| | ) | Laninya Cason, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court, with opinion.
Justices Moore and Barberis concurred in the judgment and opinion.

**OPINION**

¶ 1    After a trial, the respondent, Allen Moore, was found by a jury to be a sexually violent person pursuant to the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2004)) and was ordered to be committed to institutional care in a secure facility. The respondent appeals, presenting five issues for review. The respondent claims that (1) the trial court committed plain error by failing to conduct a proper polling of the jury, (2) the respondent's trial counsel was ineffective, (3) the trial court erred in denying the respondent's motion *in limine*, (4) the trial court erred in granting the State's motion to vacate without the respondent's presence and without a hearing being recorded by a court reporter, and (5) the State was judicially estopped from arguing that the respondent's prior nonsexual past crimes were evidence of a pattern of

1

behavior to constitute a diagnosis under the Act. For the following reasons, we affirm the judgment of the circuit court of St. Clair County.

¶ 2                                     I. BACKGROUND

¶ 3     The respondent pleaded guilty in January 1994 to one count of attempted aggravated criminal sexual assault and attempted armed robbery in St. Clair County, Illinois. On July 8, 2005, the State filed a petition to commit the respondent under section 15 of the Act (*id.* § 15). On July 8, 2005, the trial court made a finding that there was probable cause to believe that the respondent was a sexually violent person (SVP), pursuant to section 35(f) of the Act (*id.* § 35(f)), and ordered the respondent to be detained pending his trial. The trial court appointed Dr. Kirk Witherspoon as an expert for the respondent, pursuant to section 25(e) of the Act (*id.* § 25(e)). The Illinois Department of Human Services (DHS) assigned Dr. Ray Quackenbush to evaluate the respondent on behalf of the State, which he did in August 2005. Additionally, Dr. Michael H. Fogel evaluated the respondent in July 2005, pursuant to an Illinois Department of Corrections (IDOC) screening procedure for convicted sex offenders who are scheduled for mandatory supervised release or discharge.

¶ 4     In February 2006, the parties advised the trial court that the respondent had been returned to IDOC for a parole violation. The trial court dismissed the SVP petition without prejudice on April 4, 2006, on the State's motion. On April 17, 2006, the State filed a written motion to vacate the dismissal order and reinstate the respondent's SVP proceeding, explaining that IDOC had miscalculated the respondent's anticipated release date and, based on the corrected calculation, the SVP petition should proceed. The trial court granted the motion that same day. Dr. Quackenbush evaluated the respondent again in May 2006, and Dr. Witherspoon evaluated the respondent in

2

July 2006. Between 2006 and 2010, the case was delayed by continuances, discovery, and motion practice; the details of which are not necessary to the disposition of this appeal.

¶ 5    On February 8, 2010, the trial court ordered Dr. Fogel, Dr. Quackenbush, and Dr. Witherspoon to complete updated evaluations. On May 3, 2010, the State filed a motion to conduct a current SVP evaluation, indicating that Dr. Quackenbush had retired, would be relocating away from the area, and would be unavailable to testify in a trial of this matter. The State requested that a new expert be permitted to evaluate the respondent, and the trial court appointed Dr. Kimberly Weitl. Dr. Weitl evaluated the respondent for the State in June 2010 and again in October 2012. On October 13, 2013, the trial court, on motion of the State, entered an order appointing an additional expert to conduct an evaluation of the respondent. Dr. Melissa Weldon-Padera evaluated the respondent in December 2014. On April 3, 2014, on the State's motion, the trial court appointed Dr. Angeline Stanislaus to evaluate the respondent. Dr. Stanislaus completed her evaluation in July 2014. The trial court entered an additional order appointing Dr. Diane Lytton to evaluate the respondent as the respondent's expert witness. On October 24, 2014, the trial court entered an order requiring Dr. Lytton's report to be disclosed no later than October 29, 2014. Further, the trial court ordered that Dr. Lytton be made available to be deposed by the State no later than October 31, 2014. It is unclear from the record whether Dr. Lytton ever evaluated the respondent or was deposed, but she did not testify in the jury trial in this matter.

¶ 6    A jury trial was held on November 3, 2014. On the same date, the trial court addressed the respondent's motion *in limine* to exclude from trial any testimony regarding conduct that had not resulted in his conviction for a sex offense. The trial court denied the respondent's motion but granted the respondent's request for a limiting instruction admonishing the jury that such testimony was being admitted for the limited purpose of explaining the bases for the experts' opinions and

for determining what weight should be afforded to their opinions. The trial court provided the jury with these admonishments before each expert testified.

¶ 7    At trial, the parties stipulated to the respondent's conviction for attempted aggravated criminal sexual assault, a sexually violent offense as defined by the Act. The State then presented two witnesses qualified as experts in sex offender evaluation, diagnosis, and risk assessment. Dr. Angeline Stanislaus and Dr. Kimberly Weitl each testified on behalf of the State, and each opined that the respondent met the legal standard for an SVP and was dangerous. The experts first determined that the respondent suffered from two mental disorders called "other specified paraphilic disorder" and "other specified personality disorder with antisocial personality traits." Next, the experts, after conducting a risk assessment, opined that it was substantially probable that the respondent would commit further acts of sexual violence.

¶ 8    In reaching their opinions, both experts relied upon information contained in the respondent's IDOC master file, the respondent's medical and disciplinary records during his time at IDOC, and DHS. Additionally, the experts relied upon prior evaluations by other sex offender evaluators. Dr. Stanislaus conducted a clinical interview with the respondent in June 2014 with her evaluation being completed in July 2015. Dr. Weitl relied upon information that the respondent provided in interviews with prior evaluators, as the respondent refused to participate in an interview with her.

¶ 9    Dr. Stanislaus testified about how she formed her opinion as to the respondent's mental health diagnoses and risk of reoffending. Dr. Stanislaus stated that she had relied upon the respondent's pattern of behavior based, in part, on his prior criminal history consisting of a 1993 predicate sexually violent offense (predicate offense), an attempted armed robbery, a 1995 aggravated battery and aggravated unlawful restraint, and a 2001 residential burglary. Dr.

4

Stanislaus testified that it was her opinion, based on the facts surrounding each incident, that all of the respondent's history outlined above was sexually motivated. Dr. Stanislaus also considered the respondent's disciplinary history while in the custody of IDOC and DHS, including sexual misconduct citations for groping one female corrections officer and openly masturbating while in the presence of another.

¶ 10    Dr. Stanislaus discussed each incident she relied upon in diagnosing the respondent. Regarding the predicate offense in 1993, Dr. Stanislaus considered the fact that the respondent followed a woman around her apartment complex parking lot at 10 p.m., grabbed her from behind, covered her mouth with one hand, held a knife to her side with the other hand, and threatened to stab her if she screamed. The respondent "led her into an open garage" and demanded money, took her into a side room, and, while holding a knife to her neck, forced her to remove her pants and panties. The respondent had the victim pull down his pants, revealing his erect penis, and he attempted to penetrate her vaginally. The victim resisted. As they struggled over the knife, she told the respondent that she could not breathe and was having an asthmatic attack. At that point, the respondent stopped, laid down next to the victim, and caressed her buttocks before leaving. Dr. Stanislaus testified that the respondent provided a consistent description of the offense in his clinical interview.

¶ 11    Regarding the respondent's conviction for attempted armed robbery, Dr. Stanislaus summarized that the respondent committed the offense on the evening following the predicate offense. Dr. Stanislaus described the incident, stating that at around 10 p.m., a woman had come out of an apartment to get into a car in the parking lot. As she was getting into that car, the respondent attempted to enter her vehicle. The respondent was pointing a gun at her through the window when she started honking the car horn and managed to pull the car door shut. At that point,

5

the respondent ran away. Although there was no overtly sexual act committed by the respondent in the attempted armed robbery, Dr. Stanislaus found the pattern of behavior to be significant, in that the victim was a woman alone in a parking lot and the respondent had tried unsuccessfully to get into her car.

¶ 12     Dr. Stanislaus also considered the respondent's conviction of aggravated battery and aggravated unlawful restraint committed against a female corrections officer. In that incident, Dr. Stanislaus testified that the respondent, while armed with a broken metal hanger, cornered the woman in an unoccupied cellblock, restrained her arms, pushed her against the wall, pinned her by the neck using his forearm, and tried to force her into an open cell. The victim started screaming, and a nearby worker came to her aid as the respondent fled. While, again, there was nothing overtly sexual about the actions, Dr. Stanislaus opined that the details of the offense were significant because they fit into the previous pattern of the respondent's 1993 offenses—namely, arming himself with a weapon, overpowering a lone female victim, and attempting to force the victim into an even more isolated location. Dr. Stanislaus testified that "[t]he fact that he wanted to move her into a cell, away completely, that to me indicates there was a sexual intent."

¶ 13     Dr. Stanislaus also testified that she considered an incident leading to the respondent's 2001 parole violation. According to Dr. Stanislaus's testimony, the charges included an attempted criminal sexual assault; however, the respondent was ultimately convicted of residential burglary. Dr. Stanislaus testified that she considered the fact that the respondent broke into the home of his then live-in girlfriend's neighbor and waited for the neighbor to return home. He wore a nylon stocking mask, carried a 13-foot rope, and had three condoms in his pocket. According to Dr. Stanislaus's testimony, the neighbor's grandson recognized the respondent and called the police when the respondent attempted to flee the scene. A few days later, the respondent's girlfriend

6

discovered a brown bag, hidden in her drop ceiling, that contained the other leg of her nylon stocking and a "whole bunch" of condoms inside. Dr. Stanislaus testified that she had considered information relayed by the respondent's fellow inmate that the respondent had admitted that he had stalked this woman, that he could not help it, and that he needed professional help. Additionally, Dr. Stanislaus stated that she had considered the fact that the respondent reoffended while on parole, which demonstrated an inability to follow rules. Dr. Stanislaus indicated that she had considered her clinical interview with the respondent, wherein he denied that the offense was sexually motivated and claimed that he broke into the woman's home to collect money from her grandson for a marijuana transaction.

¶ 14     Dr. Stanislaus testified that, in forming her opinion, she had also considered two sexual misconduct citations that the respondent received while in IDOC custody. The first was for placing his hand on the buttocks of a female corrections officer. The second was for standing naked in his cell door and openly masturbating in the presence of a female corrections officer. Dr. Stanislaus opined that these incidents demonstrated heightened inappropriate sexual behavior, even within a controlled environment. Dr. Stanislaus acknowledged that the respondent contended that the first incident was an accident and the second incident was a misunderstanding and he was merely cleaning himself.

¶ 15     Dr. Stanislaus further testified that she had relied upon the respondent's difficulty following rules and regulations, both while in IDOC and DHS custody, citing several nonsexual incidents from the respondent's disciplinary history. These incidents included an altercation with DHS staff at the treatment and detention facility (TDF) in 2007; multiple violations for insolence, threats, and intimidation at the TDF in 2007; a battery committed against another TDF resident in 2009; and multiple threats against a TDF roommate.

7

¶ 16    Dr. Stanislaus testified that she diagnosed the respondent with other specified paraphilic disorder and other specified personality disorder, with antisocial personality traits. Dr. Stanislaus stated that she based the paraphilic disorder diagnosis on the Diagnostic and Statistical Manual (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, DSM-5 *Paraphilic Disorders* (2013) (DSM-5)). Dr. Stanislaus testified that, according to the DSM-5, "any intense and persistent sexual interests other than the phenotypically normal, physically mature consenting human partners is considered atypical, is considered a paraphilia." Dr. Stanislaus opined that the respondent's behavior met the criteria in that he was targeting nonconsenting partners such as in the predicate offense where the victim was physically normal and a mature adult, but she was fighting him. Dr. Stanislaus testified that the nonconsenting aspect of the encounter fits into the paraphilic element. Dr. Stanislaus next testified that, in order to identify a paraphilia, she looks to an intense and persistent pattern. Dr. Stanislaus testified that the circumstances and repeated offenses perpetrated by the respondent displayed a persistent pattern of behavior, spanning over a period of time across multiple victims.

¶ 17    Regarding the respondent's personality disorder diagnosis, Dr. Stanislaus testified that the respondent's behavioral history, both in his criminal conduct and his disciplinary record at IDOC and the TDF, demonstrated numerous antisocial personality traits, including recklessness, impulsivity, entitlement, and disregard for the rights of others. Dr. Stanislaus opined that the respondent's personality disorder drives his paraphilic disorder and increases his risk to act on his deviant sexual interest by disinhibiting him from respecting others' rights in order to get what he wants. Thus, Dr. Stanislaus concluded that the respondent's disorders constituted an acquired or congenital condition affecting his emotional or volitional capacity and predisposing him to commit acts of sexual violence.

¶ 18    Next, Dr. Stanislaus testified about how she formed her opinion, to a reasonable degree of psychiatric certainty, that the respondent was substantially probable to commit future acts of sexual violence. Dr. Stanislaus testified that, as part of her sex offender evaluation process, she completed what is known as a risk assessment to determine whether someone is likely to commit future acts of sexual violence. Dr. Stanislaus testified that she typically looks at the pattern of sexual behavior so far measured by "static risk factors," such as past behaviors, age, and whether violence was involved in the past behaviors, among others. Dr. Stanislaus testified that another set of risk factors that she considered are called "dynamic risk factors." She explained that dynamic risk factors are those that are capable of change. Dr. Stanislaus testified that there are actuarial instruments to aid in assessing the risk factors.

¶ 19    Dr. Stanislaus testified that she used the Static-99R as the actuarial instrument to measure the respondent's static risk factors. The respondent's score of six on the Static-99R placed him in the high risk category for reoffending. Dr. Stanislaus then looked at dynamic risk factors and identified the following factors present for the respondent: sexualized violence, offense-supportive attitudes, lack of emotionally intimate relationships with adults, impulsivity, recklessness, resistance to rules and supervision, hostility, negative emotionality, hostility towards women, and callousness or lack of concern for others.

¶ 20    Dr. Stanislaus testified that the respondent's other specified paraphilic disorder affected the respondent's emotional and volitional capacity and predisposed him to future acts of sexual violence. She further testified that the presence of antisocial personality traits increased the risk of reoffending. Dr. Stanislaus testified that, based on her training and experience in the field of sex offender evaluation, it was her opinion, to a reasonable degree of psychiatric certainty, that the

respondent met the criteria of a sexually violent person. She opined that it was much more likely than not that the respondent would reoffend.

¶ 21    The next witness to testify was Dr. Weitl. Dr. Weitl testified that she diagnosed the respondent with "other specified paraphilic disorder, sexually attracted to non-consenting women," and "antisocial personality disorder." Dr. Weitl testified that she relied upon the behavioral patterns exhibited throughout the respondent's criminal and disciplinary history to conclude that he had a sexual attraction to nonconsenting persons. Regarding the predicate offense, Dr. Weitl emphasized that the respondent's ability to maintain an erection while the victim protested demonstrated an arousal to the situation. Dr. Weitl testified that she considered that the respondent's sexual misconduct citation at IDOC, for rubbing up against and fondling the buttocks of a female officer, displayed an ongoing engagement in sexual conduct with someone who is nonconsenting. Dr. Weitl further testified that the 2001 burglary was a continuation of the respondent's sexually deviant pattern of behavior. In Dr. Weitl's opinion, the nylon mask, condoms, and rope that the respondent carried during the offense was a "rape kit." Dr. Weitl also stated that she considered the respondent's admissions to a fellow inmate that the respondent's intent during the 2001 offense was to commit rape. Dr. Weitl testified that the respondent had chosen to pursue nonconsensual sex from a neighbor rather than consensual sex from his then girlfriend. Dr. Weitl testified that the respondent was inconsistent in his self-reporting to prior evaluators but noted that the respondent had told one evaluator that he was responsible for everything in the record. Dr. Weitl testified that all of the respondent's criminal charges and convictions, be they sexual or nonsexual, were important because the facts of the case, rather than the charge or conviction, provide a greater understanding of the respondent's patterns of behavior and give insight into his risk of reoffending. Dr. Weitl testified that paraphilic urges could be

10

reflected in attempts at sexually violent behavior, even where the respondent did not succeed in those attempts. Dr. Weitl testified that the fact that the respondent continued to behave in a sexually violent manner, even after being caught and sanctioned, including in the highly structured environments of prison and parole, caused Dr. Weitl to believe that the respondent's urges were very strong and indicated to her that he was unable to control them.

¶ 22    Dr. Weitl testified that, in diagnosing the respondent with antisocial personality disorder, she found that the respondent did not follow social norms, had a history of physical violence in addition to sexual violence, disregarded the safety of others and himself, and showed a lack of remorse where he denied, justified, or made excuses for his behavior. Dr. Weitl testified that the respondent's personality disorder served to exacerbate the paraphilic disorder, enabling the respondent to meet his sexually deviant needs because he lacked any concern for the victim. Dr. Weitl testified that the respondent's antisocial personality disorder diagnosis, in addition to his paraphilic disorder, could qualify as a mental disorder under the Act because the personality disorder had specifically manifested for the respondent in sexually violent behavior against nonconsenting women. Dr. Weitl concluded that both of the respondent's diagnoses were qualifying mental disorders under the Act.

¶ 23    Dr. Weitl next testified about the respondent's likelihood to reoffend, opining that the respondent was substantially probable to commit future acts of sexual violence. Dr. Weitl testified that she had used the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R), a checklist that scores an offender's risk level, and that the responded scored as high risk. Dr. Weitl testified that she had also used the Static-99R, which is the most commonly used instrument in sex offender risk assessment. The respondent scored as high risk on the Static-99R. Dr. Weitl testified that the respondent's commission of another crime while on parole illustrated the strength of the

11

respondent's urges and his inability to control them and also showed the State's numerous attempts to deter the respondent's behaviors.

¶ 24     Dr. Weitl testified regarding possible protective factors that may reduce an individual's likelihood to reoffend. She noted that the respondent did not complete any intensive sex offender treatment. The respondent participated in some treatment prior to incarceration, but committed another offense while he was engaged in that treatment. Dr. Weitl opined that it did not appear that the respondent was gaining any benefit from the treatment. She pointed out that the respondent had refused treatment since he had been in DHS custody.

¶ 25     Dr. Weitl testified that age is another potential protective factor. She testified that some research shows that, as an individual gets older, their risk for reoffending goes down. She noted, however, that the respondent's age was 38, which was not yet to a point where age would significantly reduce his risk level. Dr. Weitl testified that the respondent's risk level was heightened by his antisocial behavior, deviant sexual interests, anger, irritability, and propensity for physical violence. Further, Dr. Weitl testified that those who have not engaged in a long-term intimate relationship reoffend at a higher rate. Dr. Weitl testified that, based on her review of all of the records and her education and experience, her professional opinion, to a reasonable degree of psychological certainty, was that the respondent was substantially probable to commit another act of sexual violence.

¶ 26     Dr. Melissa Weldon-Padera testified next as an expert witness on behalf of the respondent. Dr. Weldon-Padera opined that the respondent did not meet the criteria for commitment. She diagnosed the respondent with other specified personality disorder, with traits of antisocial personality. Dr. Weldon-Padera testified that there was a lack of evidence in the respondent's history to support a diagnosis of a paraphilic disorder and that the respondent had not shown a

12

recurrent or repetitive pattern of sexual behavior or a clear or intense deviant arousal. Dr. Weldon-Padera cited the fact that the respondent had been convicted of only one sexually violent offense and added that some of the evidence of sexual motivation regarding the 2001 burglary had come from a "jailhouse snitch." Although Dr. Weldon-Padera acknowledged that the respondent can be an unreliable historian, she nevertheless credited the respondent's claim that his erection that presented during his predicate offense was due to his attraction toward the victim and not to the nonconsenting aspect of the attack. Dr. Weldon-Padera also relied upon the fact that the respondent stopped attacking the victim during the predicate offense when she began to fake an asthma attack, suggesting that somebody who was aroused by the act would not have stopped. Dr. Weldon-Padera further said that she considered a statement that the respondent made at the time of the offense to the police—that "something just told him to rape her"—showed that his behavior was merely impulsive and opportunistic. Therefore, she believed it to be an expression of his antisocial entitlement and not an indicator of paraphilic interest. Dr. Weldon-Padera testified that she had accepted the respondent's explanation that his sexual misconduct violations in IDOC were "just impulsive acts," not preplanned actions based on urges or fantasies.

¶ 27    As for the respondent's risk of reoffending, Dr. Weldon-Padera did not offer an opinion on whether the respondent was substantially probable to commit future acts of sexual violence, as her opinion that the respondent lacked a qualifying mental disorder disqualified him for commitment as an SVP. However, Dr. Weldon-Padera testified that she had administered the Static-99R and scored the respondent in the "moderate high" risk category. Dr. Weldon-Padera acknowledged that the score was a baseline of risk that could be elevated by other risk assessment factors.

¶ 28    At the close of evidence, the trial court gave jury instructions, including the instruction that "your verdict must be unanimous." On November 6, 2014, the jury found the respondent to be an

13

SVP. The trial court asked trial counsel if he wanted the jurors to be polled, and trial counsel answered in the affirmative. The court had the following exchange:

"TRIAL COURT: Okay. Is that—what is you [*sic*] verdict—is your verdict and is this now your verdict? All say yes?

JURORS: Yes.

TRIAL COURT: Anything else?

DEFENSE COUNSEL: No. Thank you, Judge."

¶ 29   The trial court entered judgment adjudicating the respondent an SVP. The respondent filed a posttrial motion on December 4, 2014. In his posttrial motion, the respondent argued that (1) the State failed to prove beyond a reasonable doubt that the respondent was an SVP, (2) the State failed to prove the allegations beyond a reasonable doubt, (3) the verdict was a result of passion, bias, and prejudice on the part of the jury against the respondent, (4) the trial court erred in denying the respondent's motion *in limine* regarding the introduction of his nonsexual criminal history, (5) the State made prejudicial and inflammatory statements in its closing argument designed to prejudice the defendant's rights to a fair trial, (6) the State attacked Dr. Weldon-Padera's credentials, despite stipulating that she was an expert in the field of sex offender evaluations, and (7) the evidence upon which the finding was based denied the respondent of his right to a fair trial and of his rights to due process of law and equal protection. The respondent filed an amended posttrial motion incorporating the points from his initial filing but adding an allegation of ineffective assistance of trial counsel and two addendums to the motion for ineffective assistance of trial counsel outlining his allegations of ineffective assistance. The trial court filed an order on October 4, 2016, denying the respondent's posttrial motion. Following a dispositional hearing, the trial court entered an order on December 20, 2016, committing the respondent for secure care and treatment at the TDF. The

respondent filed a notice of appeal on January 12, 2017, challenging the November 6, 2014, jury verdict and the trial court's order of October 4, 2016, denying his posttrial motion.

¶ 30                                    II. ANALYSIS

¶ 31    The respondent raises five issues on appeal. The respondent argues that (1) the trial court committed plain error by failing to conduct a proper polling of the jury, (2) the respondent's trial counsel was ineffective, (3) the trial court erred in denying the respondent's motion *in limine*, (4) the trial court erred in granting the State's motion to vacate voluntary dismissal without the respondent's presence and without a hearing being recorded by a court reporter, and (5) the State was judicially estopped from arguing that the respondent's prior nonsexual past crimes were evidence of a pattern of behavior to constitute a diagnosis under the Act. We will address each in turn.

¶ 32    The Act permits the State to extend the incarceration of criminal defendants beyond the time that they would otherwise be released if they are found to be "sexually violent persons." *In re Detention of Hayes*, 321 Ill. App. 3d 178, 186 (2001). At trial, the State must prove beyond a reasonable doubt that the respondent is a "sexually violent person" because (1) the respondent has been convicted of a sexually violent offense, (2) the respondent suffers from a mental disorder, and (3) the respondent is dangerous because his mental disorder makes it substantially probable that he will commit future acts of sexual violence. 725 ILCS 207/5(f) (West 2004). A "mental disorder" is defined under the Act as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." *Id.* § 5(b).

¶ 33    Proceedings governing a petition alleging that a defendant is a sexually violent person are civil in nature. *In re Detention of Samuelson*, 189 Ill. 2d 548, 553 (2000); 725 ILCS 207/20 (West 2004). After the State files a petition, the court must hold a hearing to determine whether probable

15

cause exists to believe that the person is a sexually violent person. 725 ILCS 207/30(b) (West 2004); *In re Detention of Welsh*, 393 Ill. App. 3d 431, 445 (2009). If the court determines that probable cause exists, it must order the individual to be taken into custody and transferred to an appropriate facility for an evaluation as to whether the individual is a sexually violent person. 725 ILCS 207/30(c) (West 2004). At trial on the petition, the State must prove the petition's allegations beyond a reasonable doubt. *Id.* § 35(d). If a court or jury determines that a person is sexually violent under the Act, the person may be indefinitely committed "until such time as the person is no longer a sexually violent person." *Id.* § 40(a).

¶ 34                                 A. Jury Polling

¶ 35     The respondent first argues on appeal that the jury finding that he was an SVP was invalid because the trial court failed to properly poll the jury to confirm that its verdict was unanimous. In order to preserve a claim for appeal, a litigant must raise it both in a timely objection and in a written posttrial motion; otherwise, the litigant forfeits the claim. *In re Commitment of Haugen*, 2017 IL App (1st) 160649, ¶ 31. Here, the respondent neither lodged a contemporaneous objection nor raised this issue in his posttrial motion or any of its addendums. The respondent concedes forfeiture but asks this court to consider this issue under the plain error doctrine.

¶ 36     The plain error doctrine permits a reviewing court to consider unpreserved or forfeited claims of error if either (1) the evidence is closely balanced, and the jury's guilty verdict may have resulted from the error or (2) the error was so fundamental, and of such magnitude, that the defendant was denied a fair trial and the error must be remedied to preserve the integrity of the judicial process. *People v. Hudson*, 228 Ill. 2d 181, 191 (2008). Under both prongs of the plain error doctrine, the burden of persuasion remains with the defendant. *People v. Walker*, 232 Ill. 2d 113, 124 (2009). With respect to either prong, the initial step in conducting a plain error analysis

16

is to determine whether an error occurred. *Id.* Without reversible error, there can be no plain error. *People v. Naylor*, 229 Ill. 2d 584, 602 (2008).

¶ 37     The parties to an action have an absolute right to poll the jury as to whether each individual juror agrees with the verdict. *Bianchi v. Mikhail*, 266 Ill. App. 3d 767, 779 (1994). The purpose of polling the jury is to ensure that the verdict is in fact unanimous. *People v. McGhee*, 2012 IL App (1st) 093404, ¶ 15. The question of whether a juror has freely assented to the verdict is a factual one, which is best left to the trial court, and the manner in which the poll and subsequent questioning are conducted is largely within the trial court's discretion. *People v. Chandler*, 88 Ill. App. 3d 644, 650 (1980). Further, the requirement that the trial court poll the jury upon request is not the sole means of ensuring a unanimous verdict. *McGhee*, 2012 IL App (1st) 093404, ¶ 25. Other procedural requirements exist, such as the requirement that the jurors individually sign the verdict form. *Id.*

¶ 38     In the present case, after the foreperson read the jury verdict aloud, the trial court asked the respondent's trial counsel if he wanted the jury polled, and counsel responded in the affirmative. The following exchange then took place between the trial court and the jury:

> "TRIAL COURT: Okay. Is that—what is you [*sic*] verdict—is your verdict and is this now your verdict? All say yes?
>
> JURORS: Yes.
>
> COURT: Anything else?
>
> DEFENSE COUNSEL: No. Thank you, Judge."

¶ 39     The respondent points out that, in discussing the manner of conducting a jury poll, our supreme court has stated that: "When a jury is polled, each juror should be questioned individually as to whether the announced verdict is his own." *People v. Kellogg*, 77 Ill. 2d 524, 527-28 (1979).

17

In the same case, the supreme court acknowledged that the trial court may use its discretion in selecting the specific form of question to be asked in the polling process as long as a juror is given the opportunity to dissent. *Id*. at 528. If a juror indicates some hesitancy or ambivalence in his answer, then it is the trial judge's duty to ascertain the juror's present intent by affording the juror the opportunity to make an unambiguous reply as to his present state of mind. *Id*. Because the trial judge hears and may observe the juror's demeanor and tone of voice, it is a matter for the trial judge to determine whether a juror has freely assented to the verdict. *Id*. at 529. However, the trial judge's determination is subject to review, and a verdict cannot stand if the interrogation precludes the opportunity to dissent or the record reflects that the juror in the poll has not in fact assented to the verdict. *Id*.

¶ 40    The respondent cites a number of cases in support of his assertion that the manner of jury polling in the present case was erroneous. In *People v. DeStefano*, 64 Ill. App. 2d 389 (1965), the trial court was asked to poll the jury, but released the jury without attempting to do so. The appellate court found that under the facts of that case, the failure to poll the jury, after an affirmative request to do so, was plain error and reversable error. *Id.* at 408-09. In *People v. Bennett*, 154 Ill. App 3d 469 (1987), the judgment of the trial court was reversed, where a juror twice stated that she was not sure about her verdict and the trial court did not afford the juror the opportunity to express her feelings about the verdict in an unambiguous manner. Both cases are distinguishable, and the respondent cites no cases where, as here, a matter has been reversed solely based on the trial court's method of polling the jury *en masse*.

¶ 41    The respondent argues that the trial court's procedure, polling the jurors *en masse*, was akin to no polling having been conducted at all, since the jurors were not given an opportunity to have an unequivocal expression. We disagree.

18

¶ 42    The trial court asked trial counsel if he wanted to have the jury polled, and when trial counsel answered in the affirmative, the jury was polled to determine if the verdict was in fact unanimous. Although the trial court did not poll the jurors individually, the trial court was in the best position to observe the jurors' responses, and trial counsel was given an opportunity for further inquiry. The respondent's counsel, who was present throughout the entire polling procedure, did not object when the court polled the jury *en masse*, and declined any further inquiry when asked by the trial court if there was "[a]nything else?" We do note that, while not exact, a similar fact pattern existed in *People v. Evans*, 41 Ill. App. 3d 15, 23-24 (1976). There, the court found that failure to individually poll two jurors after orally polling the jury *en masse* did not constitute such an impediment to the defendant's substantial right to poll the jury that the question can now be preserved for review under the plain error doctrine.

¶ 43    The respondent has not offered us any evidence that the verdict was not unanimous, other than the trial court's failure to individually poll the jurors. The record is similarly bare of any indication that the jurors' verdict was not unanimous. To the contrary, the trial court instructed the jury at the close of evidence that its verdict must be unanimous. The jury returned a written verdict form, finding the respondent was an SVP, and each juror signed the verdict form.

¶ 44    Because the respondent has failed to provide any evidence of juror dissent or any evidence of actual or perceived coercion, there is no evidence that the purpose of jury polling was thwarted. Therefore, the record does not reflect a clear or obvious error that might excuse the respondent's forfeiture.

¶ 45                        B. Ineffective Assistance of Counsel

¶ 46    The respondent next argues that trial counsel provided ineffective assistance at the trial in this matter, which led to the jury's finding that the respondent was an SVP. The respondent argues

19

that trial counsel was ineffective for (1) his failure to object during the State's opening and closing arguments, (2) his failure to call Dr. Witherspoon as a defense expert, (3) his failure to show that the information regarding the jailhouse informant, James Charles, was noncredible, (4) his failure to include past, nonconvicted crimes in his motion *in limine*, (5) his trial preparation and cross-examination of Dr. Weitl, and (6) his failure to object to Dr. Stanislaus's speculative comments that went beyond her expertise.

¶ 47    Despite their civil nature, the Act provides a respondent with the right to effective assistance of counsel in SVP proceedings, as set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *People v. Rainey*, 325 Ill. App. 3d 573, 585-86 (2001). A successful ineffective assistance of counsel claim requires the claimant to prove that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's errors or omissions, there is a reasonable probability that the outcome of the proceedings would have been different. *In re Detention of Tittlebach*, 324 Ill. App. 3d 6, 10 (2001). The respondent must overcome "the strong presumption that counsel's performance fell within a wide range of reasonable professional assistance." *People v. Palmer*, 162 Ill. 2d 465, 476 (1994). Mistakes in trial strategy, tactics, or judgment do not of themselves render the representation incompetent. *Id*. Regarding prejudice, a reasonable probability that the result of the proceeding would have been different means a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694. On appeal, this court reviews a trial court's denial of an ineffective assistance claim for manifest error. *People v. Jackson*, 2020 IL 124112, ¶ 98.

¶ 48            1. Failure to Object to Opening Statements and Closing Arguments

¶ 49    The respondent argues that his trial counsel's failure to object to the State's opening and closing arguments, when the State improperly framed his past conduct as substantive evidence,

constituted ineffective assistance of counsel. The respondent points to the State's commentary during opening and closing arguments regarding his criminal history. The respondent believes the information was presented for its truth, rather than to explain the basis of the experts' opinions. One issue is at the core of both of the respondent's claims regarding opening and closing statements—whether the prosecutor's remarks were, in fact, improper. Since an attorney's performance is ineffective only if it falls below an objective standard of reasonableness (*People v. Evans*, 209 Ill. 2d 194, 220 (2004)), counsel cannot be deficient if he fails to object to remarks which are not improper. Thus, before we can determine whether there was ineffective assistance of counsel, we must first decide if there was error.

¶ 50 We will begin our analysis by examining the State's closing argument. The respondent does not quote the complained of argument presented by the State but directs us to pages of the trial transcript of the State's opening statement and concludes that "[t]he State's closing argument followed the same pattern in referencing the past conduct as substantive evidence rather than explaining to the jury that the past conduct was merely used to aid the experts in forming their opinion." We disagree.

¶ 51 The State has wide latitude in closing arguments and may comment on and draw inferences from the evidence. *People v. Miller*, 302 Ill. App. 3d 487, 495 (1998). When we review a challenge to remarks made by the prosecution during closing arguments, the comments must be considered in context of the entire closing arguments made by both parties. *In re Commitment of Kelley*, 2012 IL App (1st) 110240, ¶ 42. A jury's verdict under the Act will not be reversed based upon improper remarks made during closing arguments unless they were of such magnitude that they resulted in substantial prejudice to the respondent and constituted a material factor in the verdict. *Id*.

21

¶ 52 The State, in its quest to sustain its burden, may rely on expert witness opinion and, in doing so, may also explain the basis for those opinions. *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 36. It is well settled that an expert may give opinion testimony that relies on facts and data not in evidence if the underlying information is of the type reasonably relied upon by experts in that particular field. *In re Commitment of Tenorio*, 2020 IL App (1st) 182608, ¶ 43. The expert is permitted to reveal the contents of materials upon which he or she has reasonably relied upon in order to explain the basis of her opinion. *Butler*, 2013 IL App (1st) 113606, ¶ 31. Although the State's expert is permitted to testify to them, the underlying facts or data are admitted for the limited purpose of explaining the basis for the expert's opinion, and the basis of an expert's opinion must not be presented to the jury as substantive evidence of the underlying assertions. *Id*. In cases brought pursuant to the Act, experts may diagnose paraphilia based on a person's behavior. *In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶ 72. Thus, the details of the respondent's crimes informed the experts' diagnosis. See *id*.

¶ 53 In the present case, the State's expert witnesses concluded that the respondent met the criteria for a diagnosis of other specified paraphilic disorder, nonconsent, and was substantially probable to engage in future acts of sexual violence. In so concluding, both experts relied upon the underlying facts of the respondent's prior convictions and deviant sexual behavior. Details of a respondent's prior sexual offenses are probative of (1) the diagnosis of a mental disorder and (2) the determination that it is substantially probable that the respondent will commit further acts of sexual violence. *In re Commitment of Lingle*, 2018 IL App (4th) 170404, ¶ 54.

¶ 54 During the State's closing argument, the State repeatedly qualified its discussion of the respondent's behavioral history, indicating that its purpose was to explain the experts' diagnosis and demonstrate their credibility. In addressing the credibility of the experts, the State said:

22

"[T]here's a number of things that you're told you can do to decide which expert's testimony was the most credible to you, whether you're going to believe the State's experts or the respondent's experts." The State discussed the pattern of behavior being the basis for the doctors' diagnosis of paraphilia. Before addressing the respondent's prior conduct in that context, the State said: "What is the evidence that there's a pattern going on here?" After discussing the evidence of a pattern, the State said: "All of these things are what our doctors, *** told you were important to their decision."

¶ 55     The State did not refer to the respondent's past crimes as substantive evidence; rather, the State described the reasons why the jury should credit the testimony of its experts' opinions. The State framed the facts underlying the respondent's behavioral history as a deviant pattern of behavior the experts relied upon in reaching their diagnosis. See *Butler*, 2013 IL App (1st) 113606 (the State argued the facts and circumstances of the respondent's history of violent sexual offenses as having been relied upon and completely supporting the opinions of its expert witnesses). The State's comments regarding the respondent's prior history were an accurate representation of the expert witnesses' testimony and of the limited basis for which it had been admitted. Accordingly, as there was no basis for an objection, trial counsel's failure to object was not objectively unreasonable and did not constitute ineffective assistance of counsel.

¶ 56     The respondent also complains of comments made by the State during opening statements. First, the State described the elements that it was required to prove under the Act. The State then detailed the facts underlying the predicate offense after asking, "So what do we mean when we say sexually violent conviction?" After describing the facts underlying the predicate offense, the State indicated that one of the convictions born from the set of facts was for attempted criminal

23

sexual assault, which the State explained was listed in the statute as one of the qualifying convictions for the Act.

¶ 57    We note that during opening statements, the State may outline the expected testimony of its expert witnesses. *People v. Kliner*, 185 Ill. 2d 81, 127 (1998). This may include a preview of the underlying facts of a respondent's sexually violent offenses so that the jurors are provided proper context. *Lingle*, 2018 IL App (4th) 170404, ¶ 55. As related to the predicate offense, we do not find any error in the State's remarks, and therefore, trial counsel was not ineffective for failing to object to the same.

¶ 58    Next, the State discussed the underlying facts of the respondent's criminal and behavioral history without tying it to the experts' opinions. The State indicated that the respondent received two sexual misconduct charges while housed in IDOC. The State then described the detailed facts underlying a residential burglary charge as follows:

> "In 2001, he was released on parole; in fact, four months while he was out on parole in the community he was charged with residential burglary. Now during this incident he was found in a female neighbor's home and during that time he was found to have a pantyhose mask over his face, he had 13 feet of rope on him, three condoms, and he was wearing surgical gloves."

¶ 59    The State concluded: "I won't go into detail about that or of the sexual incident in the Department of Corrections; instead, our experts will explain that to you all later in detail." The State went on to explain that its two expert witnesses both concluded that the respondent suffered from a mental disorder called paraphilia not otherwise specified, attracted to nonconsenting females, and informed the jury that the experts would explain later what that meant relative to the respondent and his behavior.

24

¶ 60    The purpose of an opening statement is to apprise the jury of what each party expects the evidence to prove. *People v. Leger*, 149 Ill. 2d 355, 392 (1992). The State has wide latitude in making opening statements and is entitled to comment on the evidence; however, comments intending only to arouse the prejudice and passion of the jury are improper. *People v. Harris*, 2017 IL App (1st) 140777, ¶ 59.

¶ 61    The respondent relies on *Gavin*, arguing that the State repeatedly referred to the facts underlying the respondent's behavioral history as something other than the basis for the experts' opinions. In *Gavin*, the prosecutor recounted the respondent's criminal history in detail in opening statements, closing argument, and rebuttal argument. *Gavin*, 2014 IL App (1st) 122918, ¶ 73. For instance, the prosecutors argued that the experts were going to "tell" or "show" the jury about the respondent's past sex crimes, referred to the hearsay evidence as "facts" and "evidence," "argued the explicit facts underlying [the respondent's] convictions as a narrative," and did not explain to the jury how the experts relied upon these facts to diagnose or assess the respondent. *Id*. ¶¶ 73-74.

¶ 62    We agree with the respondent that the State did not properly tie the facts underlying the respondent's sexual offenses at IDOC and his residential burglary to the basis for the experts' opinions that he suffered from mental disorders. Therefore, we find that those remarks were improper and that, as a result, error occurred. That having been said, our finding that the State's remarks were improper does not end our inquiry. An error does not necessitate reversal in every instance. The question, then, is whether, in the case at bar, the improper remarks made in the opening statement were sufficiently prejudicial so as to require reversal.

¶ 63    To the extent that there was error, we find that, unlike in *Gavin*, multiple factors mitigated any prejudice to the respondent. First, the trial court advised the jury prior to the start of the trial that "statements and remarks by the lawyers ordinarily are not evidence and should not be

25

considered by you as evidence." The trial court again advised the jury of the same prior to the State's opening statement and the parties' closing arguments. Further, each expert explicitly testified that the respondent's behavior was considered only to formulate their expert opinion as to whether the respondent suffered from a mental disorder and was substantially probable to sexually reoffend. The State gave a clear explanation of the purpose for discussing the respondent's sexually deviant history during closing arguments. Finally, the trial court gave the jury limiting instructions prior to the testimony of the experts, which explained that it was

> "allowing the witnesses or each witness to testify to records and statements pertaining to the respondent's history, even though they have not been admitted into evidence. The testimony is allowed for a limited purpose. It is allowed so that the witness may tell you what she relied on to form her opinions. The material being referred to is not evidence in this case and may not be considered by you as evidence. You may consider the material for the purpose of deciding what weight, if any, you will give the opinions testified to by this witness, okay, each witness that testifies."

¶ 64 The trial court also instructed the jury of the same in its formal instructions to the jury prior to deliberation. We find that the State and the witnesses' frequent and appropriate discussion and argument regarding the basis testimony, along with the trial court's repeated instructions, were sufficient to alleviate any risk that the jury considered the State's improper discussion during opening statements as substantive evidence in returning its verdict. *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 605 (2007) (where the trial court instructed the jury that the details of the respondent's past crimes were being admitted to aid the jury in understanding the basis of the expert's opinion and not to prove the truth of the matter asserted, there is a strong presumption that jurors follow the instructions given by the court).

26

¶ 65    Under *Strickland*, a respondent must prove not only that defense counsel's performance fell below an objective standard of reasonableness, but also that this substandard performance caused prejudice by creating a reasonable probability that, but for counsel's errors, the trial result would have been different. *Evans*, 209 Ill. 2d at 219-20.  We have already determined that a brief portion of the State's opening statement was improper. It follows that trial counsel erred by failing to lodge an objection to the remarks.

¶ 66    Nevertheless, even if counsel's failure to object amounts to deficient performance, we do not find that the defendant was sufficiently prejudiced by this deficient performance. Unlike in *Gavin*, where we found that the prosecutors presented their arguments in such a way to rebut the presumption that the instructions were followed, we find that, here, the brief portion of the State's opening statement that we found to be improper was not so pervasive and inflammatory to rebut this presumption.

¶ 67    Accordingly, we cannot say that trial counsel's failure to object to these comments were of such magnitude that they resulted in substantial prejudice to the defendant and constituted a material factor to his conviction. See *People v. Griffin*, 368 Ill. App. 3d 369, 376 (2006). The State's improper opening statements did not deny the respondent a fair trial. As such, there is no reasonable probability that, but for counsel's failure to object, the result of the trial would have been different. Therefore, we conclude that the respondent has not sustained his claim under the second prong of *Strickland* and, as such, failed to demonstrate that trial counsel rendered ineffective assistance of counsel with regard to the State's opening and closing arguments.

¶ 68                    2. Failure to Call Dr. Witherspoon

¶ 69    The respondent next argues that his counsel was ineffective for failing to call an additional expert witness, Dr. Kirk Witherspoon. Dr. Witherspoon conducted an evaluation of the respondent

27

in 2006. Instead of calling Dr. Witherspoon, respondent's counsel relied upon the testimony of Dr. Weldon-Padera, whom counsel called pursuant to section 30(c) of the Act. 725 ILCS 207/30(c) (West 2004) (allowing all evaluations conducted pursuant to the Act to be admitted at all proceedings pursuant to the Act).

¶ 70 Dr. Weldon-Padera had evaluated the respondent at the request of IDOC; however, because she did not find that the respondent met the criteria for a diagnosis of paraphilia, she did not consider the third prong of the Act regarding a risk assessment. The respondent argues that trial counsel's failure to call a defense expert denied the respondent the ability to rebut the risk assessment assigned to him by the State's expert witnesses.

¶ 71 Before we can consider the merits of this issue on appeal, we find that we are constrained by the inadequacy of the respondent's appellate brief. Illinois Supreme Court Rule 341(h) (eff. May 25, 2018) governs the contents of an appellant's brief. "The rules of procedure concerning appellate briefs are rules and not mere suggestions." *Niewold v. Fry*, 306 Ill. App 3d 735, 737 (1999). The purpose of the rules is to require parties before a reviewing court to present clear and orderly arguments so that the court can properly ascertain and dispose of the issues involved. *Zadrozny v. City Colleges of Chicago*, 220 Ill. App. 3d 290, 292 (1991).

¶ 72 The respondent's arguments on this issue fail to comply with Rule 341(h)(7), which requires that the appellant's arguments contain his or her contentions and the reasons therefor, with citations to authorities and to the pages of the record relied upon in support of the appellant's contentions. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018).

¶ 73 The respondent attempts to support his contention that trial counsel was ineffective for failing to call Dr. Witherspoon, whose testimony he claims would have been more beneficial to him than Dr. Walden-Padera, for a discussion of the contents of Dr. Witherspoon's report and

28

deposition testimony. Neither is contained in the record on appeal, and as such, his brief lacks citations to the pages of the record relied upon. The failure to provide proper citations to the record is a violation of Rule 341(h)(7), the consequence of which is forfeiture of the argument. *People v. Sprind*, 403 Ill. App. 3d 772, 778-79 (2010). The respondent next quotes sections of two cases that do not share any factual resemblance to the case at bar and fails to address how or why those cases apply to the case at bar. Moreover, the respondent's argument that trial counsel's performance was ineffective for failing to call Dr. Witherspoon is presented in a conclusory paragraph that fails to include citation to any relevant authority. Mere contentions, without argument or citation to authority, do not merit consideration on appeal. *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 401 Ill. App. 3d 868, 881 (2010). Accordingly, this argument is forfeited.

¶ 74                    3. Inadequate Challenge to the Credibility of James Charles

¶ 75    The respondent next claims that trial counsel was ineffective for failing to adequately challenge the credibility of James Charles. Charles told police that the respondent admitted to him that the respondent had intended to sexually assault the victim of his 2001 residential burglary charge. This information was reviewed by the experts in the case and relied upon, *inter alia*, by the State's experts in arriving at their opinions.

¶ 76    Our review of the record, however, demonstrates that the respondent's trial counsel did challenge Charles's credibility, both on cross-examination of the State's experts and in closing arguments. Trial counsel addressed Charles's credibility in his opening statement, where trial counsel pointed out that the only evidence that there was any kind of sexual component to the 2001 residential burglary was from a cellmate. He argued that the cellmate, referring to Charles, could have been charged with murder, lying to police, or sexual assault. Trial counsel pointed out that

29

the witnesses had no idea whether Charles had incentive to lie or what benefit he may have received for providing his statement. Trial counsel also elicited testimony from Dr. Weldon-Padera regarding Charles. Dr. Weldon-Padera testified that she did not consider the 2001 charge because she read an e-mail where the assistant state's attorney on the case "admitted or acknowledged that 90 percent of that case was built on, quote, a jailhouse snitch." Based on that, along with other facts in the case, Dr. Weldon-Padera testified that she did not consider that offense in determining if there was a pattern of behavior sufficient to diagnose paraphilia.

¶ 77    Trial counsel also cross-examined Dr. Stanislaus about Charles, pointing out that the doctor never spoke with "the snitch from the jail" and was not aware of what Charles got in exchange for providing that information to the police. Trial counsel next cross-examined Dr. Weitl about the "snitch that was in the jail with [the respondent]," pointing out that Charles was incarcerated for criminal activity, and that there was no information in the doctor's review about what benefit Charles may have received for cooperating with authorities. Finally, during closing argument, trial counsel reasoned that if Charles's statements were too unreliable for prosecutors to pursue a sexually violent criminal charge based on the 2001 incident, they were too unreliable to support the experts' opinions that the respondent was an SVP.

¶ 78    Despite trial counsel's attacks on Charles's credibility during the trial, the respondent argues that counsel could have done more to "fully impeach the credibility of the informant." He bases his argument on various police reports that trial counsel failed to utilize in impeaching the credibility of Charles when cross-examining the State's experts. The respondent claims that the reports, filed with the respondent's amended posttrial motion on July 15, 2015, show that Charles was seeking to obtain a single cell in exchange for the information that he provided against the respondent and that his "celly" or cellmate was "Rice," which the respondent argues contradicts

30

the testimony of the State's expert who indicated that Charles was the cellmate of the respondent. Another report indicated that the respondent was interviewed and stated that his cellmate was Jeremy Devashier, not Charles.

¶ 79      Generally, the decision whether or not to cross-examine or impeach a witness is a matter of trial strategy which will not support a claim of ineffective assistance of counsel. *People v. Franklin*, 167 Ill. 2d 1, 22 (1995). The manner in which to cross-examine a particular witness involves the exercise of professional judgment, which is entitled to substantial deference from a reviewing court. *People v. Pecoraro*, 175 Ill. 2d 294, 326-27 (1997). When and how a witness's credibility is impeached on cross-examination is a clear matter of trial strategy. *In re Commitment of Dodge*, 2013 IL App (1st) 113603, ¶ 30. The mere fact that the respondent, or respondent's trial counsel, might have chosen a different approach to the cross-examination does not render counsel's cross-examination "objectively unreasonable." *Pecoraro*, 175 Ill. 2d at 326-27. Thus, we find that trial counsel's performance regarding Charles was a matter of trial strategy and was not deficient. See *People v. Johnson*, 372 Ill. App. 3d 772, 778 (2007) (where counsel adequately cross-examined witness, court could not conclude that counsel's representation was deficient). As such, the respondent has failed to meet the first prong of *Strickland*.

¶ 80      Further, the respondent has not demonstrated prejudice. While the respondent claims that evidence was obtainable showing that Charles was not the cellmate of the respondent, we fail to see how the presentation of such information would have created a reasonable probability of a different outcome at the respondent's SVP trial. Even excluding Charles's statement that the respondent had admitted his intent to sexually assault the victim of his 2001 burglary offense, the jury heard testimony that the respondent brought a "rape kit" to the break-in and hid a larger stash of condoms and a nylon stocking in the drop ceiling of his girlfriend's home.

31

¶ 81    As trial counsel's performance was not objectively unreasonable and the respondent was not prejudiced by trial counsel's performance as it related to attacking the credibility of Charles, trial counsel was not ineffective.

¶ 82                                4. Motion *in Limine*

¶ 83    The respondent next argues that trial counsel was ineffective in failing to seek the exclusion of the respondent's sexual behavior and disciplinary history that did not result in a criminal conviction within the respondent's motion *in limine* prior to trial. Specifically, the respondent argues that trial counsel should have included in the motion *in limine* the incident alleging that he was masturbating in front of a guard at IDOC, for which he was not charged, and a dismissed attempted criminal sexual assault.

¶ 84    In arguing this point, the respondent relies on *People v. Beshears*, 65 Ill. App. 2d 446 (1965). *Beshears* concerned whether an arrest that did not result in a conviction could be admitted substantively to prove the commission of a past crime under the Sexually Dangerous Persons Act (725 ILCS 205/0.01 *et seq*. (West 2004)), not whether, as here, the behaviors underlying a nonconviction could be referenced for the narrow purpose of explaining the basis for an expert's mental disorder diagnosis. See *In re Commitment of Hooker*, 2012 IL App (2d) 101007, ¶¶ 62, 67-68 (distinguishing *Beshears*).

¶ 85    In an SVP proceeding, an expert may rely on "the underlying behaviors manifested during prior offenses in the diagnosis of a particular mental disorder." *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 59. Accordingly, experts may discuss a respondent's sexual or nonsexual behavioral history, even if it did not result in a conviction, which is regularly relied upon by SVP experts. *Hooker*, 2012 IL App (2d) 101007, ¶¶ 51, 59-65, 76; see also *White*, 2016 IL App (1st) 151187, ¶¶ 7, 13, 15, 59, 62 (expert opined behaviors underlying armed robbery conviction

32

supported paraphilic disorder diagnosis because it was consistent with a pattern of abducting an essentially lone woman in public and taking her to an isolated second location where he struggled with the victim).

¶ 86    Here, both Drs. Stanislaus and Weitl identified the aspects of the respondent's conduct—including a dismissed attempted criminal sexual assault and an alleged instance of the respondent masturbating in front of a female corrections officer at IDOC—that, in their professional judgment, demonstrated the respondent's pattern of sexual violence against nonconsenting women and supported his paraphilic disorder diagnosis. The respondent's trial counsel was not required to perform a futile act of attempting to exclude the incidents in the motion *in limine* in order to avoid charges of ineffective assistance of counsel. *In re Detention of Erbe*, 344 Ill. App. 3d 350, 363 (2003). As such, we find that the respondent has failed to demonstrate the first prong of *Strickland* that trial counsel's performance fell below an objective standard of reasonableness and failed to demonstrate that trial counsel was ineffective for failing to seek exclusion of the incidents within the respondent's motion *in limine*.

¶ 87                    5. Failure to Impeach Dr. Weitl

¶ 88    The respondent next argues that trial counsel was ineffective in his cross-examination of Dr. Weitl, based on trial counsel's failure to utilize a transcript of Dr. Weitl's testimony from a separate case. In support of his argument, the respondent attached a copy to his opening brief of a transcript labeled Exhibit A, citing Dr. Weitl's trial testimony in *People v. Peoples*, No. 13-MR-105 (Cir. Ct. Jefferson County).

¶ 89    The respondent filed in the trial court a posttrial motion and several addendums in which he argued that trial counsel failed to use Dr. Weitl's prior testimony in other, unrelated SVP matters

33

to impeach her credibility at trial. However, in none of the posttrial filings did the respondent cite testimony from *Peoples*, nor did he attach a transcript from that case.

¶ 90    Under the circumstances, we disregard the transcript from *Peoples* attached to the respondent's opening brief, as it pertains to matters outside of the record. We first note that trial counsel's decision about how to cross-examine a witness is a matter of trial strategy that is not generally grounds for a claim of ineffective assistance of counsel. *Dodge*, 2013 IL App (1st) 113603, ¶ 30. Further, the usefulness of Dr. Weitl's testimony in *Peoples* was never argued or presented to the trial court. Accordingly, it does not otherwise appear in the appellate record. Generally, a party may not rely on matters outside of the record to support its position on appeal. *Keener v. City of Herrin*, 235 Ill. 2d 338, 346 (2009); *Wauconda Fire Protection District v. Stonewall Orchards, LLP*, 343 Ill. App. 3d 374, 377 (2003) ("Attachments to briefs not included in the record on appeal are not properly before the appellate court, and they cannot be used to supplement the record."). When a party's brief fails to comply with that rule, a court of review may strike the brief, or parts thereof, or simply disregard the inappropriate material. *Keener*, 235 Ill. 2d at 346.

¶ 91    We note that, even were we able to review the attached transcript from *Peoples*, the respondent's brief contains conclusory and vague allegations with little or no citations to legal authority presumably supporting his claim. The defendant's failure to support his contentions with proper citation to the record, legal authority, or coherent argument forfeits review of his claims. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018); *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc*., 2013 IL 115106, ¶ 56. Accordingly, we find that the respondent has forfeited this issue for review.

¶ 92                6. Objection to Testimony by an Expert Witness

34

¶ 93    Finally, the respondent argues that trial counsel was ineffective for failing to object to certain expert testimony provided by Dr. Stanislaus. The respondent argues that Dr. Stanislaus's testimony was speculative and that she was allowed to testify to legal matters that went beyond her expertise and were false. The testimony complained of was as follows:

> "Let's say that he was a free man in the community and he engaged in that behavior while in prison, but he got a sexual misconduct or some kind of sanction in prison, that could be counted. So, for example, if [the respondent] had been out in the community and had placed his hand on the buttock of another female while going past her, that would be an offense. And he—that would have resulted in a—if you had pressed charges that could result as a chargeable offense."

¶ 94    The respondent argues that the quoted testimony allowed the witness to speculate in front of the jury and to testify to legal matters that went beyond her expertise and were false. The respondent points out that sexual misconduct is not a listed offense under the definition of "sexually violent offense" in the Act. See 725 ILCS 207/5(e)(1), (1.5) (West 2004).

¶ 95    The respondent does not argue how the failure to object in this instance satisfies either prong of *Strickland*. Decisions regarding what to object to and when to do so are matters of trial strategy and thus entitled to great deference. *Pecoraro*, 175 Ill. 2d at 327. Because counsel may only be ineffective when his performance falls below the standards of reasonableness, counsel is not deficient for failing to object when an objection would be improper. *People v. Johnson*, 218 Ill. 2d 125, 139 (2005).

¶ 96    We further note that the respondent's argument misstates the nature of the challenged statements. Dr. Stanislaus was not testifying that the hypothetical action would have resulted in a sexually violent offense as defined in the Act. The quoted testimony was given in response to a

35

question regarding the scoring of the Static-99R and whether prison disciplinary tickets or nonconvictions are also scored by the instrument. Dr. Stanislaus explained that the Static-99R manual permits evaluators to score sexual misconduct violations committed in prison, such as the respondent's groping citation, as prior sexual offenses and that this subject was well within her area of expertise.

¶ 97   The respondent must satisfy both prongs of *Strickland*, and the failure to establish either is fatal to the claim. *Jackson*, 2020 IL 124112, ¶ 90. As such, we find that the respondent has failed to support his ineffective assistance claim regarding trial counsel's failure to object to certain expert testimony provided by Dr. Stanislaus.

¶ 98                    C. Denial of the Respondent's Motion *in Limine*

¶ 99   The respondent next claims that the trial court should have granted his motion *in limine*, argued just prior to the jury trial, seeking to exclude certain criminal history, including the respondent's armed robbery, aggravated battery, and unlawful restraint convictions; residential burglary convictions; and a dismissed charge of attempted criminal sexual assault. The respondent argues that the criminal history was introduced as substantive evidence and that the probative value of the evidence was outweighed by the prejudicial effect.

¶ 100   The trial court denied the motion, citing section 35(b) of the Act, which states, "At the trial on the petition it shall be competent to introduce evidence of the commission by the respondent of any number of crimes together with whatever punishments, if any, were imposed." 725 ILCS 207/35(b) (West 2004). Where a ruling on a motion *in limine* is based on an interpretation of the law, appellate review proceeds *de novo*. *People v. Way*, 2017 IL 120023, ¶ 18. Further, it is the function of the trial judge to weigh the probative value and potential prejudicial effect of evidence,

36

and the decision of the trial judge will not be reversed absent an abuse of discretion. *People v. Hobley*, 159 Ill. 2d 272, 317 (1994).

¶ 101   The respondent does not provide any basis for this court to find that the evidence of prior criminal behavior was introduced as substantive evidence, and it is clear that the respondent's criminal and behavioral history was not admitted as such. As previously discussed, the respondent's prior criminal and behavioral history was properly admitted under section 35(b) of the Act. Drs. Stanislaus and Weitl expressly described the respondent's behavioral history as the basis for their diagnoses. Further, at the request of the respondent's counsel, the trial court admonished the jury before each expert witness testified that such testimony had not been admitted into evidence but was being allowed for the limited purpose of showing what the expert relied upon to form her opinion.

¶ 102   The underlying facts reasonably relied upon by an expert witness are admissible and subject to comment for the purpose of explaining the basis for the expert witness's opinions. *Butler*, 2013 IL App (1st) 113606, ¶ 36. In SVP proceedings, an expert may rely on "the underlying behaviors manifested during prior offenses in the diagnosis of a particular mental disorder." *White*, 2016 IL App (1st) 151187, ¶ 59. Accordingly, experts may discuss a respondent's sexual or nonsexual behavioral history, even if it did not result in a conviction, both of which are regularly relied upon by SVP experts. *Hooker*, 2012 IL App (2d) 101007, ¶¶ 51, 59-65, 76.

¶ 103   Again, the respondent's reliance on *Beshears* is misplaced. *Beshears* concerned whether an arrest that did not result in a conviction could be admitted substantively to prove the commission of a past crime under the Sexually Dangerous Persons Act, not whether the behaviors underlying a nonconviction could be referenced for the narrow purpose of explaining the basis for an expert's

mental disorder diagnosis. See *Beshears*, 65 Ill. App. 2d 446; *Hooker*, 2012 IL App (2d) 101007, ¶¶ 62, 67-68 (distinguishing *Beshears*).

¶ 104    The respondent offers no other authority and develops no argument that the experts' citation of his prior arrests was unduly prejudicial. The trial court's legal determination that the expert's testimony was admissible pursuant to section 35(b) of the Act was correct, and there was no abuse of discretion in denying the respondent's motion *in limine*.

¶ 105                    D. Hearing on the State's Motion to Vacate Order

¶ 106    On April 4, 2006, the trial court entered an order dismissing the case without prejudice at the request of the State. On April 17, 2006, the State filed a motion to vacate the dismissal order with proof of service indicating that the respondent's counsel was served with said motion on April 17, 2006. On the same day, the trial court granted the State's motion outside of the presence of the respondent. The order of vacatur was signed as "[a]pproved" by both the State and the attorney for the respondent.

¶ 107    The respondent argues that the trial court erred in granting the State's motion to vacate because the respondent was not present in violation of section 25(c)(1) of the Act (725 ILCS 207/25(c)(1) (West 2004) (at any hearing conducted under the Act, the person who is the subject of the petition has the right to be present)) and the hearing was not recorded by a court reporter in violation of section 25(c)(4) of the Act (*id.* § 25(c)(4) (at any hearing conducted under the Act, the person who is the subject of the petition has a right to have the hearing recorded by a court reporter)).

¶ 108    The respondent cites *In re Barbara H.*, 183 Ill. 2d 482 (1998), where a patient was subject to involuntary commitment under the mental health code and was not present at her commitment hearing. Despite the respondent's claim that both cases involve respondents who "were not present

38

for their civil commitment hearings," *Barbara H.* is inapposite, as it involved a respondent who was not present for the entirety of her substantive commitment hearing, and not a proceeding on a routine procedural motion. The respondent additionally draws a comparison that "both respondents had attorneys they did not want to represent them," but fails to cite any authority that would make such fact relevant to the issue of the respondent's absence from proceedings on the vacatur of the trial court's dismissal without prejudice.

¶ 109   The State argues that there is nothing in the record to indicate that there was a hearing held on the motion to vacate the order; however, the order states, "This cause comes on for *hearing* on Motion of the State to Vacate the Order of the Court." (Emphasis added.) Nonetheless, a docket entry on April 17, 2006, reflects only the filing of the motion and the entry of the order and not a hearing. It is the respondent's burden, as appellant, to present an "adequate record to support [his] claim of error," and "[a]ny doubts stemming from an inadequate record will be construed against the appellant." *People v. Hunt*, 234 Ill. 2d 49, 58 (2009); see also *People v. Carter*, 2015 IL 117709, ¶¶ 20-25.

¶ 110   As the respondent notes, there was no recording made of any hearing. The term "hearing" is generally understood to mean a "judicial examination of the issues between the parties, whether of law or of fact." (Internal quotation marks omitted.) *In re Commitment of Anderson*, 2014 IL App (3d) 121049, ¶ 18. In *Lieberman v. Budz*, 356 Ill. App. 3d 932, 935-36 (2005), the court found that a detention proceeding held pursuant to section 30(a) of the Act was not a "hearing" under the Act, even though the parties called it a "hearing."

¶ 111   Here, the State's motion to vacate the voluntary dismissal order was presented to the trial court, and the trial court entered an agreed order signed by counsel for both parties. The respondent does not allege that the attorneys were present before the trial court or that any judicial examination

39

of the legal or factual issues between the parties occurred; thus, there was no "hearing" at which the respondent was entitled to be present or which we can determine should have been recorded. See *Anderson*, 2014 IL App (3d) 121049, ¶ 20.

¶ 112   Even if we were to find that a hearing occurred, and that the respondent should have been present in court and allowed to object to the State's motion to vacate, his absence was harmless. See *People v. Williams*, 2013 IL App (1st) 111116, ¶ 93 ("due process violations are subject to a harmless error review"). SVP proceedings are civil in nature and the provisions of the Code of Civil Procedure (735 ILCS 5/2-101 *et seq*. (West 2004)) apply to all proceedings under the Act. See 725 ILCS 207/20 (West 2004). Pursuant to section 2-1203(a) of the Code of Civil Procedure (735 ILCS 5/2-1203(a) (West 2004)), the State was properly permitted to file a motion to reinstate the petition. The State timely filed the April 17, 2006, motion just 13 days after entry of the April 4, 2006, judgment it sought to vacate. See *Hawes v. Luhr Brothers, Inc*., 212 Ill. 2d 93, 105-06 (2004) ("The plain language of section 2-1203(a) extends to any party, without qualification, the right to file a motion to vacate a judgment within 30 days of its entry." (Emphasis omitted.)). Section 2-1203(a) thus grants a party the right to file a motion to vacate a voluntary dismissal order and reinstate the case up to 30 days after the date of the dismissal order, which the trial court had the discretion to grant or deny. *Id*. The respondent's counsel agreed to the order, as there was no basis for an objection. Since there was no hearing at which the respondent was entitled to be present, the trial court did not err in granting the State's motion outside of the respondent's presence.

¶ 113               E. The Respondent's Prior Nonsexual Past Crimes

¶ 114   Finally, the respondent argues that the State should have been judicially estopped from arguing that his past convictions constituted a pattern of sexually motivated criminal behavior

40

suitable to form a diagnosis under the Act, where only a nonsexual conviction resulted. However, as discussed at length above, SVP experts routinely rely on underlying behaviors that are consistent with a pattern of sexual violence, even where the resulting conviction was for a nonsexual offense. *E.g.*, *White*, 2016 IL App (1st) 151187, ¶¶ 7, 13, 15, 59, 62 (expert opined behaviors underlying armed robbery conviction supported paraphilic disorder diagnosis because it followed the respondent's pattern of abducting a lone woman in public and taking her to an isolated second location where he struggled with the victim).

¶ 115   Judicial estoppel is an equitable doctrine invoked by the court at its discretion. *People v. Caballero*, 206 Ill. 2d 65, 80 (2002). To be estopped, the State must have (1) taken two positions, (2) that are factually inconsistent, (3) in separate judicial or quasi-judicial administrative proceedings, (4) intending for the trier of fact to accept the truth of the facts alleged, and (5) have succeeded in the first proceeding and received some benefit from it. *Id.*

¶ 116   Here, Drs. Stanislaus and Weitl identified with specificity the aspects of the respondent's conduct that, in their professional judgment, demonstrated the respondent's pattern of sexual violence against nonconsenting women and supported his paraphilic disorder diagnosis. Further, judicial estoppel cannot apply where "there was no certain position taken [by the State] at one proceeding that was contrary to another proceeding." *People v. Gayfield*, 261 Ill. App. 3d 379, 386 (1994). In the present case, the State's presentation of expert testimony interpreting behavior as fitting within an overall pattern of sexual violence against nonconsenting women is not factually inconsistent with the negotiation of guilty pleas for nonsexual offenses relating to those incidents. Acceptance of a plea to a particular nonsexual offense is not commensurate with the position that a nonsexual offense was committed to the exclusion of all other chargeable offenses or that no

41

other offenses, sexual or nonsexual, occurred. As such, we find that the doctrine of judicial estoppel does not apply, and the respondent's claim must fail.

¶ 117                                       III. CONCLUSION

¶ 118   For the foregoing reasons, the judgment of the trial court of St. Clair County is affirmed.


¶ 119   Affirmed.

*In re Commitment of Moore*, 2023 IL App (5th) 170453

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of St. Clair County, No. 05-MR-199; the Hon. Laninya Cason, Judge, presiding. |
| **Attorneys for Appellant:** | Brian D. Flynn, of Flynn Guymon & Garavalia, of Belleville, for appellant. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, Michael M. Glick and Evan B. Elsner, Assistant Attorneys General, of counsel), for the People. |