2024 IL App (1st) 230246

No. 1-23-0246

Opinion filed October 4, 2024

Sixth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| *In re* COMMITMENT OF EDWARD GAVIN | Appeal from the Circuit Court of Cook County. |
| | No. 06 CR 80009 |
| (The People of the State of Illinois, Petitioner-Appellee, v. Edward Gavin, Defendant-Appellant). | The Honorable Hon. Laura Ayala-Gonzalez, Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Tailor and Justice C.A. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1    In 2006, the State sought to commit Edward Gavin under the Sexually Violent Persons Commitment Act (SVP Act) (725 ILCS 207/1 *et seq.* (West 2004)). A determination in 2017 made Gavin an SVP, leading to his commitment. In 2019, Gavin petitioned for discharge. The trial court found probable cause to believe that Gavin no longer met the criteria for an SVP. In September 2022, a jury determined that Gavin remained an SVP under the statute. He was remanded to the custody of the Department of Human Service Treatment and Detention Facility (TDF) for "control, care, and treatment in a secure setting until further order of court."

¶ 2      Gavin appealed. He contends that the State failed to meet its burden of proof in establishing that (i) he continues to suffer from a mental disorder and (ii) this disorder makes it substantially probable that he would engage in acts of sexual violence if released. See 725 ILCS 207/5(f), 65(b)(2) (West 2018).

¶ 3      Further, Gavin argues that the trial court erred by (i) denying his motion *in limine* to exclude testimony regarding his diagnoses and (ii) granting the State's motion *in limine* to exclude raising the diagnoses of "Other Specified Paraphilic Disorder, Non-Consent" (OSPD Non-Consent)." Gavin also argues that (iii) the State's repeated misuse of a limited-purpose opinion testimony as substantive evidence during argument denied him a fair trial and (iv) the trial court erred by instructing the jury that OSPD Non-Consent is generally accepted.

¶ 4      We find the State did not prove that Gavin was "substantially probable" to reoffend as the SVP Act requires. Thus, we need not reach Gavin's other claims and reverse.

¶ 5                                    BACKGROUND

¶ 6      Edward Gavin was born in 1958. In 1975, he was convicted of rape, indecent liberties with a child, and attempted rape after he sexually assaulted two victims in a public housing complex's elevator on the same day. In 1980, Gavin was convicted of attempt rape, and in 1988, he was convicted of aggravated criminal sexual assault and was sentenced to 15 years in prison.

¶ 7      While on parole in 1996, Gavin did not commit another sex offense but was arrested for two burglaries and eventually released on bond.

¶ 8      In 2006, the State petitioned to commit Gavin under the SVP Act (725 ILCS 207/1 *et seq.* (West 2004)). After a jury trial in which two expert witnesses testified regarding their diagnoses of Gavin with "paraphilia, not otherwise specified, nonconsent," he was committed to the custody of the Department of Human Services' TDF. *In re Commitment of Gavin*, 2014 IL App (1st)

122918, ¶ 14 *(Gavin I)*. Gavin appealed. This court reversed and remanded for a new trial based on the finding that prosecutorial error deprived him of a fair trial. After a second trial, a jury again found Gavin an SVP under the statute. On appeal, this court affirmed. *In re Commitment of Gavin*, 2019 IL App (1st) 180881 *(Gavin II)*.

¶ 9     In 2019, Gavin petitioned for discharge. The circuit court found probable cause to believe Gavin was no longer an SVP under the statute, and the matter went to trial on whether Gavin remained an SVP. The State needed to prove by clear and convincing evidence (725 ILCS 207/65(b)(2) (West 2018)) that (i) Gavin had a conviction for a sexually violent offense, (ii) Gavin still suffered from a qualifying mental disorder, and (iii) the disorder made future acts of sexual violence substantially probable. 725 ILCS 207/5(f) (West 2018). The first element was uncontested, but the second and third elements were litigated. A jury decided Gavin remained an SVP.

¶ 10                                *Pretrial Motions*

¶ 11     Gavin filed a motion *in limine* to preclude testimony regarding "paraphilia or paraphilic disorder involving sexual attraction to non-consenting persons," the diagnosis proffered by the State. In the alternative, Gavin sought to exclude testimony that did not comply with the "Rule 702/*Daubert* standard ([*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)]) or the *Frye*-plus-reliability standard." *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923) (requiring expert testimony that scientific evidence "gained general acceptance in the particular field in which it belongs").

¶ 12     The State countered by filing a motion *in limine* to preclude "any pleading, testimony, remarks, questions, or argument that might state, infer, or imply" that OSPD Non-Consent (i)

cannot legally be used in SVP cases, (ii) is inadmissible, (iii) is not generally accepted or a valid diagnosis, or (iv) violates a psychologist's code of ethics.

¶ 13 The court denied Gavin's motion and granted the State's, barring Gavin from eliciting testimony that OSPD Non-Consent is not generally accepted.

¶ 14 *Trial*

¶ 15 State's Evidence

¶ 16 The State presented one witness, Dr. David Suire, a licensed clinical psychologist for the Department of Human Services qualified as an expert in the evaluation and risk assessment of sex offenders. For his risk assessment of Gavin, Suire considered (i) actuarial data, (ii) empirically identified risk factors (also known as dynamic risk factors), (iii) factors specific to Gavin, and (iv) protective factors. Suire described actuarial instruments as a "means for combining variables to determine overall risk" and equated their use in predicting the likelihood that someone will commit a future sex offense to how insurance companies set car premiums.

¶ 17 Suire first evaluated Gavin in 2022. Gavin declined to be interviewed in person, so Suire based his report on a review of Gavin's records. He used the Diagnostic and Statistical Manual of Mental Disorders (DSM) to opine that Gavin still suffered from OSPD Non-Consent because sexual identity and interests are "generally lifelong" and "don't tend to go away," even though older people are "[t]ypically *** better at managing their sexual urges." On cross, he admitted that researchers "assume" OSPD Non-Consent is lifelong but knew of no study determining this.

¶ 18 Suire believed that Gavin was dangerous due to his OSPD Non-Consent, which affects emotional or volitional control and makes it substantially probable that he will engage in acts of sexual violence. On cross, Suire agreed that the DSM defines mental disorder differently from the SVP Act in that a DSM mental disorder need not predispose an individual to engage in acts of

sexual violence. He also agreed that the DSM is cautious about its use in forensic settings because diagnostic information can be misunderstood. A DSM diagnosis does not necessarily contain implications about etiology or causes, nor does having a diagnosis prove the degree of control an individual has over the behavior.

¶ 19    OSPD appears in the DSM, but the specifier of "Non-Consent" does not. Suire testified he used criteria for a general paraphilia, claiming that "every aspect" of what he does is "widely accepted in the field and commonly used." Suire conceded that efforts to add a Non-Consent or rape paraphilia (also known as Paraphilic Coercive Disorder) to the DSM had failed.

¶ 20    Suire diagnosed Gavin with mild Alcohol Use Disorder, based on Gavin's past statements about alcohol affecting his relationships, employment, and legal issues. According to Suire, this disorder would "further lower Gavin's ability or willingness to control and manage his paraphilic disorder." During cross, however, Suire conceded that the statements referred to Gavin's use of alcohol decades ago.

¶ 21    Gavin also was diagnosed with Antisocial Personality Disorder (ASPD) because of a "pervasive pattern of violation of the rights of others or disregard for the rights of others." Surie based the diagnosis on Gavin's "significant criminal history," "lack of remorse, recklessness, disregard for the safety of self or others, [and] deceptiveness." Suire said this disorder, like OSPD Non-consent, tends to persist but lessen, especially after age 40.

¶ 22    As evidence of ongoing ASPD, Suire cited recent records of Gavin's "large stash of pornography" and an undated instance of Gavin "trying to get a physical altercation going." To Suire, this undated instance meant Gavin was "obviously willing to violate rules." Suire did not explain why he believes ASPD is a mental disorder under the SVP Act. He also cited a lack of

remorse, evidenced by Gavin not having engaged in sex offender treatment, though he would "expect those symptoms to be somewhat controlled" in a secure setting.

¶ 23   Using Static-99R and Static-2002R assessment tools, Suire scored Gavin based on Gavin's condition when he was 37 years old as an 8 on each. Suire acknowledged that Gavin's age 64 at the time of the trial would result in a Static-99R score of 5 and a Static-2002R score of 6. On cross-examination, Suire agreed that the absolute risk rate associated with a Static-99R score of 5 was 12.8% over 5 years, and for a Static-2002R score of 6 was 19.2% over 5 years. He claimed a pure actuarial approach wouldn't allow for adjustment for age.

¶ 24   Suire did not think that the actuarial instruments provided a complete picture of Gavin's risk, so he assigned "things like deviant sexual arousal, general self-regulation problems, ASPD, and "a couple others." Suire did not explain why he assigned additional risk factors other than to say Gavin "still has problems with self-regulation, he still has problems with his deviant sexual arousal."

¶ 25   During cross, Suire admitted that he could not determine how many people in the Static-99R sample had the risk factors he assigned to Gavin. The factors are "not fully independent, so you can't just add up all the correlations. So, there's no way to combine the score. That is a weakness in that particular data point." Nor is there a manual on how to weigh dynamic risk factors. Instead, Suire relied on his own clinical judgment as part of the "adjusted actuarial approach" and acknowledged that the pure actuarial approach is "considered highly reliable" and his approach introduced bias.

¶ 26   Suire found three case-specific factors "particularly notable." Regarding the 1988 offense, Suire expressed concern that Gavin's arousal from nonconsenting victims may be difficult for someone to avoid if that is how the person derives full sexual satisfaction and sex with consenting

persons does not have the same effect. Additionally, Suire noted the reported difficulty in removing Gavin from a victim on two occasions shows Gavin cannot or does not want to stop and is out of control. Finally, Gavin supposedly exposed himself to DHS staff in 2019, which "has some implications for the risk assessment." Suire did not explain "implications."

¶ 27    Because Gavin had not verbalized insight into his sexual offending, Suire described Gavin as having denied committing the offenses and admitting to some nonconsensual sexual contact, which, according to Gavin, was no longer a problem. Although Gavin attended treatment while in prison, he had not engaged in treatment at the TDF.

¶ 28    Suire discussed the protective factors of age, debilitating health condition, and participation in sex offender treatment. As to age, he acknowledged the difference in actuarial scoring based on Gavin's current age but maintained Gavin remained a substantial risk despite age. During cross on this topic, Suire agreed that older individuals generally have lower recidivism rates than younger individuals, declining notably after age 60. Nevertheless, Suire maintained that Gavin's risk was not declining, at least as of 2019.

¶ 29    Suire acknowledged that the most recent research cited in his 2022 report was from 2012, even though Suire attended the annual ATSA conference almost yearly over the last decade. When confronted with his latest research on the relationship between age and recidivism from 2007, Suire claimed that, despite additional research since then, "none of the basic conclusions have really changed." Although he had not seen the research presented at the 2021 ATSA conference about stratifying people by age on the Static-99R, Suire said, "I don't know that stratifying necessarily resolves the issue. It didn't in the prior studies."

¶ 30    About Gavin's hip replacement surgery and use of a cane, Suire said, "[I]t's probably safe to say that he's not as capable of attacking or restraining a person as he was in the past." Gavin

also suffered from hypertension and had an orchiectomy (removal of a testicle). Suire pointed to Gavin having used a weapon or convinced a person he had a weapon, concluding, "I think his ability to commit sex offenses in every context would be somewhat limited, but he would still be able to do so in the right situation." On cross, Suire admitted he had no formal training on how physical conditions affect the risk of reoffending and had not consulted a medical professional, even though he could have contacted a TDF physician. Suire used his own judgment to determine that none of Gavin's medical conditions constituted a protective factor.

¶ 31    Finally, Suire identified cognitive behavioral relapse prevention as the type of treatment that, statistically, shows a substantial reduction in risk, but Gavin had declined treatment. On cross, however, Suire admitted that he did not include this in his report research about effectiveness of treatment, how treatment reduces recidivism rates, or the difference in recidivism rates between people who have done treatment and who have not.

¶ 32    Suire noted that, in earlier examinations, Gavin either denied remembering the 1975 assaults or denied committing them. Suire's report stated that ASPD "would not in all cases" qualify as a mental disorder under the SVP Act but qualifies in this case because it "increase[s] [respondent's] recidivism risk" "in combination with his paraphilic disorder."

¶ 33    The court admitted Suire's CV, Suire's 2022 report, and a certified copy of Gavin's 1988 conviction.

¶ 34                            Defense Evidence

¶ 35    Clinical Psychologist Dr. Brian Abbott testified that he examined Gavin in 2015 and again in 2020 to assess his eligibility under the SVP criteria. Both examinations included a review of records and a personal interview. In 2022, Abbott submitted a third report based on updated records, concluding that Gavin no longer met the criteria without needing a reinterview.

¶ 36    Abbott said that a combination of mental conditions led to Gavin's commitment as an SVP and that without OSPD Non-Consent, Gavin no longer exhibited symptoms of a mental disorder. Abbott's findings, supported by the records he reviewed, align with Dr. Tsoflias' testimony during the 2017 commitment trial. Dr. Tsoflias indicated that Gavin's ASPD alone, without a paraphilic disorder, did not constitute a "mental disorder" under the SVP Act. Similarly, Dr. Weitl testified in the 2017 trial that while the diagnosis of ASPD "could be" a mental disorder on its own for Gavin, she was not making that claim. ("It might be. That was not my opinion, but it could. Someone could make that argument.") Instead, Dr. Weitl opined that ASPD was a mental disorder in "combination" with OSPD Non-Consent and alcohol use disorder.

¶ 37    Abbott addressed the issue of risk assessment if Gavin was found to suffer from an SVP Act mental disorder. He referenced evolving professional knowledge or methods indicating that individuals age 60 and older, like Gavin, experience a 50% decline in reoffending risk. Psychological and physiological factors—such as decreased sexual drive, improved judgment and reasoning, and reduced energy associated with medical problems—contribute to this decline.

¶ 38    Based on recent research, Abbott testified that the five-year recidivism rate for a score of 5 now stands at 6.4%, marking a decline of 75% to 80% from 2017. This data supports the conclusion that Gavin is not substantially probable to engage in acts of sexual violence.

¶ 39    Abbott testified that the inter-rater reliability for OSPD Non-Consent was determined by research from 2018 to be "poor" because "in 82% of the situations where one evaluator concluded that an individual suffered from PCD, the other evaluator disagreed." He maintained that Suire's diagnosis of Gavin with OSPD Non-Consent lacked reliability, though Abbott's opinion was excluded from jury consideration. Abbott explained that "validity" means "does the diagnosis actually assess what it intends to measure or define" and "reliability" means "the extent of

precision" in identifying "if an individual suffers from a diagnosis." Also, "inter-rater reliability" is measured by determining how many clinicians would agree on the diagnosis of OSPD Non-Consent when given the same information.

¶ 40                                    Verdict

¶ 41    The jury determined that Gavin met the criteria for being a continuing SVP under the statute. Gavin was remanded to the custody of the Department of Human Service TDF for "control, care, and treatment in a secure setting until further order of court."

¶ 42                                    ANALYSIS

¶ 43    Gavin argues that the State failed to prove by clear and convincing evidence that he is still a sexually violent person. The SVP Act defines a "sexually violent person" as someone who has been convicted of a sexually violent offense and is dangerous because he or she has a mental disorder that makes it "substantially probable" to engage in acts of sexual violence in the future. 725 ILCS 207/5(f) (West 2018). The State needed to prove by clear and convincing evidence that Gavin (i) still has a mental disorder and (ii) still is dangerous because the mental disorder makes it substantially probable that he will engage in acts of sexual violence. 725 ILCS 207/5(f), 65(b)(2) (West 2018).

¶ 44    Gavin focuses, in pertinent part, on the substantial probability element. Substantially probable means much more likely than not. *In re Detention of Bailey*, 317 Ill. App. 3d 1072, 1086 (2000). This definition "cannot be reduced to a mere mathematical formula or statistical analysis." *In re Detention of Hayes*, 321 Ill. App. 3d 178, 188 (2001). Instead, the factfinder makes a "commonsense judgment" based on "all factors that either increase or decrease the risk of reoffending." *Hayes*, 321 Ill. App. 3d at 188. Relatedly, clear and convincing evidence is "that quantum of proof that leaves no reasonable doubt in the mind of the fact finder about the truth of

the proposition in question." (Internal quotation marks omitted.) *In re Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 12. The standard "requires proof greater than a preponderance, but not quite approaching the criminal standard of beyond a reasonable doubt." *In re D.T.*, 212 Ill. 2d 347, 362 (2004).

¶ 45    This court has traditionally reviewed cases in which a party bears the burden of proving facts by clear and convincing evidence under the manifest weight standard. *E.g.*, *In re C.N.*, 196 Ill. 2d 181, 208 (2001). And, on appeal from a discharge trial, we review for manifest error. *In re Commitment of Sandry*, 367 Ill. App. 3d 949, 978 (2006). A finding is against the manifest weight of the evidence when the record shows that the trial court should have reached the opposite conclusion or the finding is unreasonable, arbitrary, or not based on the evidence. *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 46    In SVP cases, an individual's liberty is at stake. SVP cases predominately rely on psychological testimony. Only a full and accurate exploration of the diagnoses minimizes the risk of unjust confinement, especially where the issue is not what got the respondent committed but whether the respondent at the time of the trial still meets the criteria for commitment under the SVP Act. With only Suire testifying for the State and Abbott for the defense, the jury heard two ultimately divergent opinions but not-so-different underlying facts.

¶ 47    For the State, Suire considered (i) actuarial data, (ii) empirically identified risk factors (also known as dynamic risk factors), (iii) factors specific to Gavin, and (iv) protective factors. Suire's testimony for most factors faltered because he often undercut his own assessments.

¶ 48                                *Actuarial Data*

¶ 49    On both the Static-99R and Static-2002R, he initially scored Gavin as an 8 while computing Gavin as if 37 or 38 years old rather than his current age and risk. He then characterized Gavin's risk as "about as high risk as you're going to get."

¶ 50    But Suire acknowledged that the most recent research cited in his 2022 report was from 2012. When confronted that the latest research he referenced was from 2007, Suire claimed without apparent support that, despite additional research since then, "none of the basic conclusions have really changed."

¶ 51    Nonetheless, he acknowledged that Gavin's current age of 64 would result in a Static-99R score of 5 and a Static-2002R score of 6. And he agreed that the absolute risk rate associated with a Static-99R score of 5 was 12.8% over five years and for a Static-2002R score of 6 was 19.2% over 5 years.

¶ 52                              *Dynamic Risk Factors*

¶ 53    Suire denied that the actuarial instruments provided a complete picture of Gavin's risk and, thus, also used an adjusted actuarial approach that factored in dynamic risk factors. He did so even though he agreed that "[a]ny time you introduce clinical judgment or outside facts you introduce bias."

¶ 54    For dynamic risk factors, Suire assigned to Gavin "things like deviant sexual arousal, general self-regulation problems, antisocial personality disorder," and "a couple others." He did not explain why he gave these risk factors to Gavin other than to say he "still has problems with self-regulation, he still has problems with his deviant sexual arousal."

¶ 55    Suire also admitted that he had no way to determine how many people in the Static-99R sample had the risk factors he assigned to Gavin but did not reoffend. The factors are "not fully

independent, so you can't just add up all the correlations. *** [T]here's no way to combine the score. That is a weakness in that particular data point." Nor was there a manual on how to weigh dynamic risk factors. Instead, Suire simply decided how much weight to give the factors.

¶ 56                                    *Case-Specific Factors*

¶ 57    Suire found three factors "particularly notable" for Gavin. First, in the 1988 offense, Gavin was unable to get an erection with prostitutes who were willing to have sex with him but was able to get an erection when he sexually assaulted the maid. Second, he found notable the claimed difficulty in removing Gavin from a victim on two occasions.

¶ 58    Finally, he noted that when Gavin supposedly exposed himself to DHS staff in 2019, he was over 60. "[F]rom [his] perception, [ ] Gavin [ ] committed a sexual offense or what would have been a sexual offense in the community after age 60," which "ha[d] some implications for the risk assessment." Yet, he did not further explain those implications.

¶ 59                                    *Protective Factors*

¶ 60    Suire used his own judgment to determine that none of Gavin's medical conditions were a protective factor, rather than Gavin's age, health conditions, or participation in sex-offender treatment while in TDF.

¶ 61    As to age, Suire acknowledged the difference in actuarial scoring based on Gavin's current age but concluded that it did not affect his opinion that Gavin remained substantially probable to reoffend. Yet he agreed that older individuals generally are less likely to recidivate than younger individuals. A decline in risk of 2% yearly begins at 40 years old and is particularly notable after age 60. But he argued that Gavin's risk was not declining, at least as of 2019.

¶ 62    As to health conditions, Suire testified that Gavin had hip replacement surgery and was using a cane: "[I]t's probably safe to say that he's not as capable of attacking or restraining a person

as he was in the past." But he pointed to Gavin having once used a weapon or convinced a person a weapon was present. He summarized, "I think [Gavin's] ability to commit sex offenses in every context would be somewhat limited, but he would still be able to do so in the right situation."

¶ 63    Yet, Suire admitted he had no formal training on how physical conditions affect the risk of reoffending. He conceded that he could have called a TDF physician for more information. Gavin, in addition to having had a total right hip replacement and using a cane, also suffered from hypertension and had a testicle removed.

¶ 64    As to sex-offender treatment, Suire identified cognitive behavioral relapse prevention as the type of treatment that, statistically, shows a substantial reduction in risk. He noted Gavin had declined treatment but admitted that he did not include in his report any research about effectiveness of treatment, how treatment reduces recidivism rates, or the difference in recidivism rates between people who have done treatment and who have not.

¶ 65                         *Summary of Factors*

¶ 66    Frequently, Suire held out his analysis as scientifically rigorous but buckled when asked how he reached his conclusions. Even on its own terms, Suire's testimony is arbitrary and not based on the evidence. See *In re Commitment of McCormack*, 2021 IL App (1st) 181930-U, ¶ 30 (giving examples of how proof may fail on own terms).

¶ 67    For example, Suire initially anchored his actuarial analysis to Gavin's age decades ago and offered the jury no reason why doing so remained sound scientifically. Rather, he pivoted to his analysis of dynamic risk factors, denying that a pure actuarial approach fully captured Gavin's risk. Yet, even in that analysis, he owned that his judgment or "bias" would dominate and not because his methods were replicable by other licensed clinical psychologists. On the contrary, the

use of dynamic risk factors undermined any effort to compare Gavin, in a falsifiable way, with other sex offenders.

¶ 68    Suire's analysis of Gavin's protective factors illustrates how the sands shifted under his conclusions. Suire determined that neither Gavin's age nor physical infirmities served as protective factors. This assessment, however, is notable, given Suire's lack of formal training in the effects of physical conditions on the risk of reoffending, and his failure to consult readily available physicians while conducting the analysis.

¶ 69    As a result, through Suire's testimony, the State offered the jury a conclusion (that Gavin was substantially probable to reoffend) based on internally conflicting or, at times, absent rationale. This created manifest error. *Best*, 223 Ill. 2d at 350.

¶ 70                              CONCLUSION

¶ 71    The State did not present clear and convincing evidence that Gavin is "substantially probable" to reoffend.

¶ 72    We reverse.

*In re Commitment of Gavin*, 2024 IL App (1st) 230246

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 06-CR-80009; the Hon. Laura Ayala-Gonzalez, Judge, presiding. |
| **Attorneys for Appellant:** | Michael R. Johnson and Daniel T. Coyne, of Law Office of Michael R. Johnson LLC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Katherine M. Doersch and Matthew D. Skiba, Assistant Attorneys General, of counsel), for the People. |