NOTICE
Decision filed 07/28/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220642-U

NO. 5-22-0642

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* COMMITMENT OF MICHAEL BOAZ | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Fayette County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 15-MR-17 |
| | ) | |
| Michael Boaz, | ) | Honorable |
| | ) | Kevin S. Parker, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Justices Moore and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the trial court's commitment order where the State proved beyond a reasonable doubt that the respondent is a sexually violent person, and the respondent did not receive ineffective assistance of counsel.

¶ 2    On June 22, 2021, a jury found the respondent, Michael Boaz, to be a sexually violent person (SVP) pursuant to the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2020)), and he was committed to the Illinois Department of Human Services (DHS). The respondent appeals, arguing (1) that the State failed to prove that he was an SVP and (2) that he had ineffective assistance of trial counsel. For the following reasons, we affirm the judgment of the trial court.

1

¶ 3                                    I. BACKGROUND

¶ 4      On March 17, 2015, the State filed a petition pursuant to the Act seeking to have the respondent adjudicated an SVP and committed to the care and custody of DHS. The petition alleged that on December 21, 2007, the respondent pled guilty to two counts of aggravated criminal sexual abuse in violation of sections 12-16(d) and 12-16(c)(1)(i) of the Criminal Code of 1961 (720 ILCS 5/12-16(d), (c)(1)(i) (West 2006)). The respondent was sentenced to seven years' incarceration in the Illinois Department of Corrections (IDOC) on each count, to be served consecutively. Both convictions were sexually violent offenses as defined by the Act. Further, the defendant had been evaluated by Dr. Angeline Stanislaus, a clinical psychologist, who submitted a report dated March 15, 2015. In that report, Dr. Stanislaus diagnosed the respondent with pedophilic disorder, antisocial personality disorder, substance use disorder, and ruled out other specified paraphilic disorder. The petition alleged that the respondent was dangerous to others because he suffered from a mental disorder that made it substantially probable that he would engage in future acts of sexual violence.

¶ 5      On March 23, 2015, following a hearing, the trial court found probable cause that the respondent was subject to commitment under the Act. Subsequently, the trial court ordered him to be detained at a facility approved by DHS, and to undergo an evaluation by DHS.

¶ 6      The matter proceeded to a jury trial on June 21 and 22, 2021. At trial, the State presented the testimony of Dr. Stanislaus and Dr. Amy Louck Davis. Dr. Stanislaus was qualified as an expert in clinical psychology, specifically in sex offender evaluations, diagnosis, and risk assessment. She testified that she had evaluated the respondent to determine if he met the criteria for civil commitment under the Act. Before the evaluation, she reviewed records relating to the respondent's history for any sex-related offense, charge, arrest, or conviction, as well as his general

2

criminal history. She also reviewed the disciplinary history and treatment history from IDOC. Dr. Stanislaus scheduled an interview with the respondent, but he declined to participate. Dr. Stanislaus then completed her report based upon the available records.

¶ 7    Dr. Stanislaus testified to the facts underlying the qualifying offense that the State had relied upon for the SVP petition. According to Dr. Stanislaus's testimony, in 2006, the respondent was dating a woman with children, and her 15-year-old daughter reported to a school counselor that the respondent had raped her. Illinois Department of Children and Family Services (DCFS) investigated and, during the investigation, the woman's eight-year-old son reported that the respondent had fondled his penis on approximately three occasions.

¶ 8    Dr. Stanislaus also reviewed other convictions in the respondent's criminal history, including three counts of aggravated criminal sexual abuse in 2000. In that case, the respondent married a woman who had three children, two daughters and a son. The eight-year-old son reported to his father that the respondent hit him. DCFS investigated the claim, resulting in the two daughters reporting that the respondent had inappropriately touched both of them. The respondent was convicted on all three counts and sentenced to six years' incarceration in IDOC. In 1993, the respondent was charged with unlawful restraint, battery, and criminal sexual abuse. The police report indicated that that the respondent threatened to kill a man if he did not perform oral sex on the respondent, forcing the man to cooperate. The victim did not appear to testify at trial and the case was dismissed. In 1992, the respondent was charged with criminal sexual abuse and battery, and pled guilty to battery. Dr. Stanislaus testified that these charges stemmed from the respondent placing his hands on the breasts of a woman without her consent.

¶ 9    Dr. Stanislaus testified that the dismissed charges are important to consider for purposes of her evaluation because they establish a pattern of behavior. Dr. Stanislaus noticed two patterns of

deviant sexual behavior: the respondent's sexual interest in (1) male and female children and (2) forcible sex. She also explained that it was important to consider other, nonsexual offenses in a respondent's history because those behaviors further establish patterns, such as disregarding the consequences of illegal behaviors. In this case, the defendant had eight other criminal cases over a period of 16 years.

¶ 10    Next, Dr. Stanislaus testified that she considered the respondent's social history, including that he reported being sexually molested as a child and the details of his adult relationships. The respondent was married twice; both of his wives had children and the respondent was convicted of molesting the children in both of his marriages. Dr. Stanislaus stated, "That means he's seeking women with children and seeking women who would bring the children to his house or he would be able to go to their house and spend the night. *** [That] is quite significant." Furthermore, even after the defendant had been incarcerated for molesting children, once he was released from prison, he again found a mother of children and perpetrated sexual acts against the children. Dr. Stanislaus found that behavior significant, as his need to satisfy his sexual drive was strong enough that he did not stop himself from repeating the same behaviors for which he had faced significant consequences. Dr. Stanislaus also testified that the respondent had 21 major and 12 minor violations while in IDOC. These violations were of note to Dr. Stanislaus as they indicated the respondent could not follow rules even in a very rigid environment such as IDOC.

¶ 11    After reviewing these records, Dr. Stanislaus diagnosed the respondent with (1) pedophilic disorder, sexually attracted to males and females nonexclusive, (2) other specified paraphilic disorder (OSPD) nonconsent, and (3) antisocial personality disorder. Dr. Stanislaus explained the elements of each mental condition, their definitions under the American Psychiatric Association Diagnostic Statistical Manual (DSM-5), and how the respondent qualified for each diagnosis.

4

¶ 12    Dr. Stanislaus conducted an assessment using an actuarial instrument, the Static-99R, which aids in determining an individual's risk of reoffending. The Static-99R uses 10 risk factors that are calculated to determine an offender's risk category compared to other sex offenders. The Static-99R scores range from a -3 to 12. Anything above a six is considered very high risk. Dr. Stanislaus testified that she had conducted a Static 99-R in 2015, when she scored the respondent at a five. In her 2015 report, Dr. Stanislaus explained that a score of five placed the respondent in the moderate high risk category. Dr. Stanislaus explained that the reasons the respondent scored a five, including the number of and nature of his prior sex offenses and offenses including nonsexual violence.

¶ 13    In addition to the Static 99-R, Dr. Stanislaus also looked at dynamic risk factors, which attempt to explain what is driving sexual offending. Dynamic risk factors have been identified by research, and Dr. Stanislaus identified the respondent's dynamic risk factors, which included the presence of deviant sexual interest; multiple paraphilia; offense-supportive attitudes; conflicts in intimate relationships; and poor cognitive problems. Dr. Stanislaus then explained how each dynamic risk factor relates to recidivism. Additionally, she testified that the respondent had not taken responsibility for his actions, which would need to be addressed in treatment. Dr. Stanislaus described that, in order to change through treatment, an individual has to understand what they did and why it is wrong. After her comprehensive assessment, Dr. Stanislaus testified that, in her expert opinion, the respondent met the criteria for civil commitment under the Act in 2015. She also opined that it was substantially probable the respondent would commit future acts of sexual violence.

¶ 14    Dr. Stanislaus completed an updated evaluation of the respondent in 2020. During this evaluation, the defendant participated in the interview. The respondent's Static-99R score

5

increased to a six in this evaluation due to a recalculation of the number of the respondent's sex offenses. In 2015, Dr. Stanislaus gave the respondent two points for prior sex offenses; however, in 2016, when she looked more closely, she realized that he actually qualified to receive three points for his prior offenses. She considered the same dynamic risk factors from 2015. The defendant had been participating in treatment since 2015, but had not made much progress and remained in the second of five phases of treatment. The respondent also completed a penile plethysmography (PPG) evaluation in 2018, which indicated his arousal to children and reflected his deviant sexual interests. Dr. Stanislaus also considered protective factors that can decrease risk of reoffending, such as old age, physical infirmity, or the completion of treatment. She did not find any protective factors applied to the respondent. Dr. Stanislaus testified that, in her expert opinion, the respondent met the definition for an SVP under the Act, and that it was substantially probable, or "much more likely than not," that the respondent would commit future acts of sexual violence.

¶ 15    During cross-examination, when questioned about dynamic risk factors, Dr. Stanislaus explained that dynamic risk factors may increase risk, and "the more you have risk factors, the more of a layering effect. *** The more elements present, the more the risk." Dr. Stanislaus explained how the number of offenses is a static factor, but the details of the offenses may also be a dynamic risk factor. She stated, "[T]hese offenses that he's committed, they are not only illegal but also deviant. So the deviance element is the dynamic risk factor." Both of Dr. Stanislaus's reports were entered into evidence without objection.

¶ 16    During trial the following day, the State called Dr. Amy Louck Davis, who was qualified as an expert in clinical psychology, specifically in sex offender evaluation, diagnosis, and risk assessment. Dr. Louck Davis evaluated the respondent twice, first in 2016 and again in 2019. Dr. Louck Davis testified that she reviewed all of the respondent's records, as well as Dr. Stanislaus's

6

2015 evaluation of the respondent. The respondent declined to be interviewed in either of the evaluations, so Dr. Louck Davis completed the evaluations without his participation. Dr. Louck Davis stated that she had reviewed the respondent's criminal history to determine that he committed a qualifying offense under the Act, *i.e.*, aggravated criminal sexual abuse. Dr. Louck Davis also found a pattern of grooming behaviors through gaining access to his victims by being involved in romantic relationships with the children's mothers, as well as by use of force. Dr. Louck Davis testified to the other offenses in the respondent's history, including his cases in 2000, 1993, and 1992. Dr. Louck Davis found that the respondent had two deviant sexual interests, specifically, interest in children and sex acts that involve the use of intimidation or threat of physical harm or force. Dr. Louck Davis stated that she had considered all the charges in the respondent's criminal history, not just convictions, in forming her opinions. She testified that the respondent's history showed his unwillingness to comply with rules or laws and not learning from past behaviors. Dr. Louck Davis testified that the respondent suffered from childhood sexual abuse and instability at home, which were contributing factors that resulted in an antisocial personality. To fully form her opinion, she also considered the respondent's summaries of behavioral reports from IDOC, as well as the results of the PPG evaluation. Dr. Louck Davis diagnosed the respondent with pedophilic disorder, OSPD nonconsent, antisocial personality disorder, and three substance use disorders.

¶ 17    Dr. Louck Davis utilized two risk assessment actuarial instruments in the respondent's evaluation, the Static-99R and Static-2002R. The respondent scored a six on the Static-99R, placing him in the well above average risk category, which is the highest risk category, meaning he is 3.77 times more likely to sexually offend than the average sex offender. The respondent scored an eight on the Static-2002R, placing him in the well above average risk range, which is

again the highest risk category for that instrument. Dr. Louck Davis stated that this score "equates to about five times greater likelihood to reoffend than the average convicted sex offender."

¶ 18 Dr. Louck Davis also considered dynamic and empirical risk factors. Some of these factors included the presence of deviant sexual interest in both children and nonconsensual acts; having more than one sexual disorder; the presence of childhood sexual abuse; and a history of other criminal behavior. Dr. Louck Davis explained that she considered the actuarial numbers alongside the additional dynamic risk factors, explaining that when there are a greater number of risk factors there is greater risk of reoffending.

¶ 19 The respondent's only protective factor was his age, which was accounted for in the actuarial numbers. While the respondent had completed some sex offender treatment, Dr. Louck Davis stated that the respondent had not completed enough treatment to prevent himself from offending again in the future because he was only on step two of five in the program. Dr. Louck Davis opined that it is "[m]uch, much more likely than not" that the respondent will sexually offend in the future and that he met all three required elements of an SVP under the Act.

¶ 20 During cross-examination, Dr. Louck Davis was asked about an article authored by Karl Hanson, one of the authors of the manual for using the Static 99-R, which counsel indicated updated the 5-year and created new 10-year sexual recidivism rates. While Dr. Louck Davis was not familiar with the article, she acknowledged that there is ongoing research on recidivism rates, but indicated there had not been any published updated rates in the manual for the Static-99R. As there has been no update to the manual or training, she had not adopted the new rates into her practice. She stated that it would be inappropriate to utilize the new recidivism rates before they are established as part of the manual and training was offered for the changes. She also explained the scores and how they relate to recidivism rates for others in the same category as the respondent.

8

On redirect examination, when asked about dynamic and static risk factors, Dr. Louck Davis explained that a dynamic risk factor cannot change an actuarial score, but they can impact an overall assessment of risk. Dr. Louck Davis's 2016 report was entered into evidence without objection. The State then rested.

¶ 21  The respondent called Dr. Luis Rosell, a psychologist who is a licensed sex offender evaluator and who was accepted as an expert in his field. Dr. Rosell testified that he had met with the respondent in December 2018, to conduct an evaluation, and finalized his report on February 1, 2019. Dr. Rosell reviewed the respondent's criminal and correctional history, reports from the State's evaluators, and treatment records. Dr. Rosell found that the respondent had a qualifying conviction under the Act, and diagnosed him with pedophilic disorder and antisocial personality disorder. Dr. Rosell also utilized the Static-99R and scored the respondent a five. He explained the discrepancy in his score of five, the above-average category, compared to the State's score of six, the well-above-average category, was due to his calculation of the respondent's prior charges.

¶ 22  Dr. Rosell testified to his utilization of the Static-99R and the factors he considered, including the respondent's participation in treatment and the sexual abuse he experienced in his childhood. While the presence of sexual childhood abuse could lead to offending, Dr. Rosell said that history does not correlate to recidivism. Dr. Rosell stated that participation in treatment lowers recidivism rates, and even though the respondent had not completed a treatment program yet, he still considered it a protective factor.

¶ 23  After the respondent's evaluation in 2018, Dr. Rosell testified that new recidivism rates were updated in a March 2021 research article, which had a larger subject group than the prior numbers were based on, and that the update "demonstrates that the recidivism rates continue to go down as the sample sizes even get larger." The average rate of recidivism for sex offenders in the

9

sample group was 6.7% over a five-year period. For offenders who scored a five on the Static-99R, the rate is now 11.9%, down from 15% in 2016, and for offenders who scored a six, the rate is now 18%, down from 20%. Dr. Rosell stated that this demonstrated recidivism rates are decreasing, and that more information was available due to longer review periods and sample sizes. Dr. Rosell used the new, updated numbers despite the fact that they are not included within the manual for scoring the Static-99R, because the numbers were published in a reputable journal and he updates reports based on what the studies indicate. Dr. Rosell opined that, because the average sex offender "doesn't re-offend anyway," no matter how many times more likely the respondent is to reoffend than the average sex offender, it was still not a very high number.

¶ 24    Dr. Rosell said that in his practice, he does not count some factors as a dynamic risk if it is already accounted for in the static factors. Dr. Rosell said considering those factors is "double dipping." Dr. Rosell opined that the respondent was not substantially likely to reoffend.

¶ 25    On cross-examination, Dr. Rosell stated that deviant sexual interest in children does not need to be considered a dynamic risk factor that would increase the risk of recidivism because it is already considered by the fact that the respondent was diagnosed with pedophilia. Dr. Rosell acknowledged that when previously released, the respondent sexually reoffended against a 15- and 8-year-old.

¶ 26    When questioned about the respondent's treatment progress, Dr. Rosell stated that after six years in DHS, the respondent was on stage two of five in his treatment program, and he had not yet identified his cycle of offending. Due the amount of time he had been confined and his age, Dr. Rosell stated that the respondent denied being as sexually interested as he was in the past, despite the results of the PPG exam.

¶ 27    Dr. Rosell testified that he chose to use the most updated numbers available on recidivism rates, even if other experts choose to wait on a "more official notice" to begin using the new data. Dr. Rosell stated that the respondent's pedophilia and antisocial personality disorder have impacted his ability to control his decisions in the past and that both conditions were still present, but because of the respondent's age, he is less likely to continue to offend.

¶ 28    On redirect examination, Dr. Rosell stated that he considers dynamic risk factors, but they do not influence his decision beyond the risk calculated by the Static-99R. Dr. Rosell based his opinion on the updated recidivism rate numbers, and did not believe that the percentage rate of recidivism for an individual that scored in the respondent's range was indicative of a high risk of reoffending. Dr. Rosell's report was entered into evidence without objection. The respondent then rested.

¶ 29    The parties held a jury instruction conference. The State proposed a limiting instruction based on Illinois Pattern Jury Instructions, Civil, No. 2.04 (2016) (hereinafter IPI Civil 2.04), which would instruct the jury that testimony that an expert witness relied on to form her opinion is not substantive evidence. Defense counsel objected to the trial court giving the instruction, indicating her belief that this instruction could confuse the jury about which records it may consider, and the State agreed to withdraw the instruction. The parties agreed not to send any of the exhibits back to the jury, with defense counsel commenting: "There's too much detail we were careful to stay away from."

¶ 30    The State and the respondent each gave closing arguments. The State argued that the respondent was substantially probable to reoffend based on his risk assessments and the experts' opinions. The State also summarized the information used by the experts during their testimony, including the respondent's history and the details of his prior sex offenses. The respondent argued

that he was not substantially likely to reoffend and to consider his expert's testimony as more credible than the State's expert's due to the updated recidivism report data. The jury then deliberated and found the respondent to be a sexually violent person.

¶ 31 The trial court held the dispositional hearing on September 2 and 14, 2022, in which both parties presented testimony from their respective experts. The trial court took the matter under advisement, and on September 22, 2022, entered the dispositional order that directed the respondent committed to DHS for treatment until he is no longer an SVP. During the September 22, 2022, hearing, the trial court addressed a letter sent by the respondent which the trial court considered a *pro se* claim of ineffective assistance of counsel. The trial court addressed the respondent's *pro se* claims pursuant to the framework announced in *People v. Krankel*, 102 Ill. 2d 181, 183 (1984), and dismissed the claims after a first stage preliminary inquiry. The respondent, through trial counsel, filed a notice of appeal on September 22, 2022, and the Office of the State Appellate Defender was appointed to represent the respondent on appeal.

¶ 32                                   II. ANALYSIS

¶ 33 On appeal, the respondent argues that (1) the State presented insufficient evidence that the respondent is an SVP, where the State experts did not explain the basis of their opinions that he was substantially likely to reoffend and relied on disproven, misapplied, or erroneous factors; and (2) the respondent received ineffective assistance of counsel where trial counsel failed to object to improper testimony and argument, and failed to request a limiting jury instruction. We will address each issue in turn.

¶ 34                         A. Sufficiency of the Evidence

¶ 35 The respondent argues the State failed to prove that he was an SVP. Under the Act, the State must prove beyond a reasonable doubt that the respondent (1) was convicted of a sexually

12

violent offense enumerated in the Act, (2) has a mental disorder, and (3) the mental disorder makes it substantially probable that he will engage in future acts of sexual violence. 725 ILCS 207/5(f), 35(d) (West 2022); *In re Commitment of Fields*, 2014 IL 115542, ¶ 20. The term "substantially probable" means "much more likely than not." (Internal quotation marks omitted.) *In re Commitment of Moody*, 2020 IL App (1st) 190565, ¶ 62.

¶ 36 When reviewing the sufficiency of the evidence, a reviewing court asks whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the Act beyond a reasonable doubt. *Fields*, 2014 IL 115542, ¶ 62. It is the trier of fact's responsibility to resolve conflicts in the evidence, determine the credibility of witnesses, and decide what weight is afforded to witness testimony. *Moody*, 2020 IL App (1st) 190565, ¶ 43. Thus, we may not substitute our judgment for that of the trier of fact and will not reverse its decision unless the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt. *Id.*

¶ 37 In the present case, the respondent does not dispute the first two elements of the statute, that he was convicted of a sexually violent offense and has a mental disorder within the meaning of the Act. Rather, the respondent challenges only the third element, that his mental disorder makes him substantially probable to commit future acts of sexual violence. To that end, he argues the State's experts failed to adequately explain the basis for their opinions. First, by relying too heavily on the Static-99R's category description of "well above average risk," instead of the percentages from the actuarial tables used with the instrument. According to the respondent, the average risk of reoffending for sex offenders was 6.7%, and an increase to 18%, or 20%, depending on the expert the jury credited, was insufficient to meet the State's burden of proof. Next, the respondent argues that the State's experts failed to explain the effect of dynamic risk factors in relation to risk

13

of reoffending, arguing the dynamic risk factors relied upon by the State's experts were disproven on cross-examination, where Dr. Stanislaus testified that dynamic risk factors do not increase risk. The respondent argues that the experts then failed to explain the basis for each risk factor and did not quantify the risk factors with a numerical score.

¶ 38    In support of this argument, the respondent relies upon two cases, both of which are readily distinguishable. First, in the unpublished case *In re Commitment of McCormack*, 2021 IL App (1st) 181930-U, in which the State's expert testified that the respondent had a "statistically 'average risk' of reoffending" based on actuarial instruments. *Id.* ¶ 12. On appeal, this court concluded that the State "left too much to inference" in questioning its expert such that the expert never explained why the respondent's risk of recidivism was substantial. *Id.* ¶ 42. This court criticized the trial court's reliance on several aggravating factors that were either "contradict[ed]" by the evidence or were "[d]isproven" to apply to the respondent. *Id.* ¶¶ 30-41.

¶ 39    Similarly, in *In re Commitment of Gavin*, 2024 IL App (1st) 230246, this court found insufficient evidence where the State's lone expert often "undercut his own assessments" and "buckled when asked how he reached his conclusions." *Id.* ¶¶ 47-69. For example, the State's expert admitted that he did not have sufficient information as to how the respondent's age and health conditions would affect his likelihood of reoffending even though the respondent was 60 years old at the time of trial, had a hip replacement, and walked with a cane. *Id.* ¶¶ 62-63.

¶ 40    The present case differs from *McCormack* and *Gavin*. Here, the State's experts both testified that the respondent's Static 99-R score of six placed him in the highest category of risk. Dr. Louck Davis testified that this score makes the respondent 3.77 times more likely to sexually offend than the average sex offender. Dr. Louck Davis also testified that the respondent's score on the Static 2002-R was an eight, and other sex offenders who scored an eight on that instrument

14

were five times as likely as the average sex offender to reoffend. The respondent's own expert, Dr. Rosell, stated that he scored the respondent at a five on the Static-99R, placing him in the moderate high risk category. Dr. Rosell explained that a five would correlate to a five-year rate of recidivism of 15% and a six would be 20%. If one were to adopt the new numbers Dr. Rosell testified about from the new research article, those numbers would reduce to 11.9% and 18%, respectively.

¶ 41 The State's experts did not, however, rely on the actuarial instruments alone in forming their opinions. In addition to the respondent's actuarial scores, the State's experts also explained the presence of various dynamic factors that increased the respondent's likelihood of reoffending. The respondent claims Dr. Stanislaus testified that dynamic risk factors do not increase risk because she stated on cross-examination: "I think he's already high risk on the static and his dynamic risk factors just *explain* why it is high." (Emphasis added.) During direct examination, however, she stated, "[A]ny deviant interest, meaning anything outside the normal sexual interest, increases the risk. *** [E]specially deviance towards children, that increases the risk as well, significantly." She explained that dynamic risk factors are what drives sexual offending and the reason why individuals repeatedly offend. Dr. Stanislaus identified the respondent's dynamic risk factors, which included the presence of deviant sexual interest; multiple paraphilia; offense-supportive attitudes; conflicts in intimate relationships; and poor cognitive problems. Dr. Stanislaus then explained how each dynamic risk factor relates to recidivism. Additionally, she testified that the respondent had not taken responsibility for his actions, which would need to be addressed in treatment. Dr. Stanislaus described how, in order to change through treatment, an individual had to understand what they did and why it was wrong. Further, Dr. Stanislaus testified that the respondent's poor impulse control and decision-making created difficulty in changing his behavior.

15

¶ 42    In explaining dynamic risk factors, Dr. Louck Davis testified:

> "The way to use the dynamic or empirical factors that are all kind of individualized is about the preponderance of them, how many of them are we adding on. So it doesn't change a score or relate to a number, but I know there's more risk than there was without them."

She testified that having more than one sexual disorder, like the respondent, is a dynamic risk that creates a greater likelihood of sexual offending. A complete review of the trial testimony shows that both of the State's experts testified to the presence of dynamic risk factors, how they can increase risk for respondents, and how they increased risk for the respondent in the present case.

¶ 43    The respondent argues that without any increase in risk, his actuarial scores alone do not meet the State's burden of proof, focusing on the updated recidivism rates presented by Dr. Rosell, which he opined were indicative of a low risk of recidivism. Drs. Louck Davis and Stanislaus, however, placed the respondent in the highest risk category and did not utilize the updated recidivism rates because those rates had not yet been adopted by the actuarial manuals. Further, as indicated above, their opinions were based on a comprehensive risk assessment, not on the actuarial instruments alone.

¶ 44    The standard of substantially probable to reoffend "cannot be reduced to a mere mathematical formula or statistical analysis." *In re Detention of Hayes*, 321 Ill. App. 3d 178, 188 (2001). It is the jury's role to weigh conflicting expert testimony. Ultimately, the jury found the State's experts' comprehensive risk assessments more compelling than Dr. Rosell's and determined the respondent was substantially probable to reoffend. Thus, we defer to the trier of fact on expert credibility and will not reweigh conflicting expert testimony. *In re Commitment of Evans*, 2021 IL App (1st) 192293, ¶ 67.

¶ 45    While each case is fact-specific, this case is well in line with a multitude of cases finding sufficient evidence that the respondent was an SVP. See, *e.g.*, *In re Commitment of Floyd*, 2025 IL App (1st) 230047-U, ¶ 121 (collecting cases). Viewing the evidence in the light most favorable to the State, a reasonable trier of fact could find beyond a reasonable doubt that the respondent is substantially probable to commit future acts of sexual violence.

¶ 46                                    B. Ineffective Assistance of Counsel

¶ 47    We first note that where a defendant in a proceeding under the Sexually Dangerous Persons Act (SDPA) contends he was denied effective assistance of counsel at trial, and he is represented by different counsel on appeal, he may raise that issue on direct appeal from the circuit court's judgment. *People v. Lawton*, 212 Ill. 2d 285, 295 (2004). While the SDPA is a separate statute from the Act, both statutes are "closely related in subject and proximity, and they are undoubtedly governed by one spirit and a single policy." *People v. Masterson*, 207 Ill. 2d 305, 329 (2003). Thus, our supreme court's determination in *Lawton* indicates that ineffective assistance of counsel claims may be raised on direct appeal pursuant to the Act as well.

¶ 48    Here, the defendant tendered a letter to the trial court raising issues of ineffective assistance of trial counsel. The trial court indicated it was conducting a preliminary hearing pursuant to *Krankel* and its progeny, which developed a procedural framework for the resolution of *pro se* posttrial claims of ineffective assistance of counsel in criminal cases. See *People v. Murray*, 2017 IL App (3d) 150586, ¶ 21. In *In re Commitment of Walker*, 2014 IL App (2d) 130372, ¶ 56, the court held that "*Krankel* does not apply in cases under the [Sexually Violent Persons Commitment] Act." Neither party addressed the trial court's *Krankel* ruling on appeal. Therefore, we will proceed to address the respondent's ineffective assistance of counsel claims without addressing the trial court's preliminary *Krankel* inquiry.

17

¶ 49    On appeal, the respondent argues that his trial counsel rendered ineffective assistance of counsel by (1) failing to request a limiting instruction regarding the basis of opinion testimony, (2) failing to object to certain expert testimony, and (3) failing to object to the State's improper use of offense details and examination results during closing argument.

¶ 50    Despite being civil in nature, the Act provides a respondent with the right to effective assistance of counsel in SVP proceedings, as set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *People v. Rainey*, 325 Ill. App. 3d 573, 585-86 (2001). A successful ineffective assistance of counsel claim requires the claimant to prove that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's errors or omissions, there is a reasonable probability that the outcome of the proceedings would have been different. *In re Detention of Tittlebach*, 324 Ill. App. 3d 6, 10 (2001). The respondent must overcome "the strong presumption that counsel's performance fell within a wide range of reasonable professional assistance." *People v. Palmer*, 162 Ill. 2d 465, 476 (1994). Mistakes in trial strategy, tactics, or judgment do not of themselves render the representation incompetent. *Id.* Regarding prejudice, a reasonable probability that the result of the proceeding would have been different means a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694. Ineffective assistance of counsel claims are reviewed *de novo*. *People v. Johnson*, 2021 IL 126291, ¶ 5.

¶ 51                    1. Failure to Request a Limiting Instruction

¶ 52    The respondent argues that his trial counsel was ineffective for objecting to a limiting instruction about expert testimony, specifically IPI Civil 2.04. Illinois Pattern Jury Instructions, Civil, 2.04 (2016). IPI Civil 2.04 provides:

18

"I am allowing the witness to testify in part to [books] [records] [articles] [statements] that have not been admitted in evidence. This testimony is allowed for a limited purpose. It is allowed so that the witness may tell you what he/she relied on to form his/her opinion[s]. The material being referred to is not evidence in this case and may not be considered by you as evidence. You may consider the material for the purpose of deciding what weight, if any, you will give the opinions testified to by this witness."

This instruction "should be given when the facts or data underlying an expert's opinion have been revealed to the jury but are not admissible in evidence." Illinois Pattern Jury Instructions, Civil, No. 2.04 Notes on Use (2016). IPI Civil 2.04 limits the purpose of records used by experts but not admitted into evidence.

¶ 53    During the jury instruction conference, the State proposed that the trial court instruct the jury pursuant to IPI Civil 2.04. Trial counsel responded: "I think it could confuse [the jury]. I'm wondering, what are they talking about? Which ones?" The State then withdrew the instruction based on trial counsel's objection. The respondent argues that trial counsel's failure to seek this instruction was deficient performance and could not be considered trial strategy.

¶ 54    When considering whether trial counsel's performance was deficient, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Generally, matters of trial strategy will not support a claim of ineffective assistance of counsel unless counsel fails to conduct any meaningful adversarial testing. *People v. Patterson*, 217 Ill. 2d 407, 441 (2005). Trial counsel's

19

decision of whether to request a limiting instruction may be viewed as strategic. *People v. Perez*, 2012 IL App (2d) 100865, ¶ 66. We do not agree with the respondent's argument that there was no strategic reason for trial counsel's failure to request a limiting instruction.

¶ 55    At trial, the respondent's expert heavily relied upon a research article which contained updated recidivism rates for the Static 99-R, which were lower than those previously published, to form his opinion that the respondent did not meet the criteria to be an SVP, and the State's experts did not utilize the updated numbers. During closing arguments, trial counsel focused on that research article, stating that the opinions of the experts "are only as good as what they're based on." Trial counsel reiterated the importance of the recidivism rates from the report, stating, "[That] wasn't an opinion, that was a study." Trial counsel chose to repeatedly focus on the article Dr. Rosell utilized in forming his opinion that recidivism rates are low, and if trial counsel had requested a limiting instruction, it could have impacted the jury's consideration of the article the defense argument relied upon.

¶ 56    Furthermore, we consider that the First District recognized IPI Civil No. 2.04 can be a confusing instruction, as it is logically incoherent to ask a jury to evaluate the basis underlying an expert's testimony without considering whether those underlying bases are true. *In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶ 78. Thus, it is conceivable that defense counsel here believed IPI Civil No. 2.04 may have been more confusing to the jury than helpful to the defense, particularly where counsel may have wanted the jury to consider some assertions in the data underlying the respondent's expert's opinion as substantive evidence. Trial counsel's statement to the court in objecting to the instruction indicates that was true here.

¶ 57    The respondent faces a high bar in arguing ineffective assistance of counsel, and the defendant must overcome the presumption that counsel pursued a sound trial strategy. *Strickland*,

466 U.S. 689. Under the circumstances, we cannot say trial counsel's failure to request IPI Civil No. 2.04 fell outside the wide range of professional assistance.

¶ 58                                    2. Failure to Object to Expert Testimony

¶ 59    The respondent also argues that trial counsel's performance was deficient for failure to object to improper expert testimony. He argues that the State's experts portrayed hearsay as "the actual facts" or "what happened," despite no conviction of a sexual assault in some of his cases. He argues that trial counsel should have objected to the remarks because they were presented as substantive evidence. He alleges that trial counsel's failure to object to the testimony resulted in ineffective assistance of counsel.

¶ 60    The respondent points to specific instances when trial counsel should have objected to expert testimony describing information about the respondent's sex offenses included in records and reports. Some of these statements include: (1) Dr. Stanislaus testifying to the contents of the records she reviewed, which were portrayed to the jury as "the actual facts" of the 2006 offense, including graphic details of sexual crimes against children; (2) Dr. Stanislaus testifying to the contents of the records in the 1992 case as "what happened in that instance," even though the respondent was not convicted of the offense; (3) Dr. Stanislaus testifying that her portrayal of the 1993 "actions" of the case were the substantively true facts because "there's no evidence in the court documents that they did not occur"; and (4) Dr. Louck Davis testifying to the contents of records from the 2000 offense, portraying them as the "details."

¶ 61    The State, in its quest to sustain its burden, may rely on expert witness testimony and, in doing so, may explain the basis for their opinions. *In re Commitment of Moore*, 2023 IL App (5th) 170453, ¶ 52. Experts may discuss a respondent's sexual or nonsexual behavioral history, even if it did not result in a conviction, which is regularly relied upon by SVP experts. *Id.* ¶ 85. Decisions

21

regarding what to object to and when to do so are matters of trial strategy and, thus, are entitled to great deference. *People v. Pecoraro*, 175, Ill. 2d 294, 327 (1997). Because counsel may only be ineffective when his performance falls below the standards of reasonableness, counsel is not deficient for failing to object when an objection would be improper. *People v. Johnson*, 218 Ill. 2d 125, 139 (2005).

¶ 62    Contrary to the respondent's argument, trial counsel *did* object to the previous sex offenses referenced by Dr. Stanislaus. While Dr. Stanislaus testified to the details of the 2006 sex offense, trial counsel objected on the grounds of hearsay because the respondent was charged for two offenses but only convicted of one. Trial counsel specifically stated, "[Any] statement[s] that were made about [the offenses] should not be repeated now by [Dr. Stanislaus] that are outside of the things he pled guilty to, because they're triple hearsay and they're also unnecessary to make your point." Trial counsel reiterated that Dr. Stanislaus should narrow the details contained in her testimony whenever possible. During a sidebar conversation, the trial court stated that Dr. Stanislaus "has the right to tell the jury what information she relied upon in forming her opinion. *** He obviously pled to at least two serious counts, and I think any of those facts are beyond objection as far as her relying on it and her testifying to that." Trial counsel made no further objection to the expert testimony.

¶ 63    It is well settled that an expert may give opinion testimony that relies on facts and data not in evidence, as long as the underlying information is of the type reasonably relied upon by experts in that particular field. *In re Commitment of Tenorio*, 2020 IL App (1st) 182608, ¶ 43. The expert is permitted to reveal the content of material upon which he or she has reasonably relied in order to explain the basis of her opinion. *Moore*, 2023 IL App (5th) 170453, ¶ 52.

22

¶ 64     The experts explained that the records they reviewed are the type of records that are typically relied on by experts in their field when conducting an SVP evaluation. As Dr. Stanislaus said, relying upon all criminal history and sex-related offense records, "is the standard of doing this evaluation." Additionally, the experts stated which offenses resulted in a conviction, and why nonconviction offenses were still important to consider during an evaluation because they establish a pattern of behavior.

¶ 65     A review of the record shows that all the above-mentioned statements were offered by the experts as information from the records that they properly considered when completing their evaluation of the respondent. Accordingly, as there was no basis for an objection, trial counsel's failure to object was not objectively unreasonable and did not constitute ineffective assistance of counsel.

¶ 66                 3. Failure to Object to the State's Closing Argument

¶ 67     The respondent next argues that trial counsel's failure to object to the State's closing arguments, when the State improperly framed his past conduct as substantive evidence, constituted ineffective assistance of counsel. The respondent states that when describing the contents of the records, the State offered the information for its truth, rather than to explain the basis for the experts' opinions. Since an attorney's performance is ineffective only if it falls below an objective standard of reasonableness (*People v. Evans*, 209 Ill. 2d 194, 220 (2004)), counsel cannot be deficient if she fails to object to remarks which are not improper. *Moore*, 2023 IL App (5th) 170453, ¶ 49. Thus, before we can determine whether there was ineffective assistance of counsel, we must first decide if the State's remarks were improper. *Id.*

¶ 68     The respondent claims that the State, during closing arguments, told the jury of "the actual facts" of the respondent's 1992 offense, despite no conviction being entered in that case.

23

Specifically, the prosecutor said, "[The respondent] used force, he touched her breast." Another example was about the respondent's 1993 case. The State said that the respondent "demanded oral sex" from the victim and "when [the victim] didn't comply, when he didn't consent, he gets placed in a choke hold, he gets chased around the house, he gets forced to comply." The State also referenced the results of the PPG examination, and the respondent claims it was offered as substantive evidence to prove that the respondent had a deviant sexual interest. The respondent argues that these comments constitute improper closing argument, and trial counsel should have objected.

¶ 69    The State has wide latitude in closing arguments and may comment on and draw inferences from the evidence. *People v. Miller*, 302 Ill. App. 3d 487, 495 (1998). When we review a challenge to remarks made by the prosecution during closing arguments, the comments must be considered in context of the entire closing arguments made by both parties. *In re Commitment of Kelley*, 2012 IL App (1st) 110240, ¶ 42.

¶ 70    As previously discussed, expert opinion testimony may rely on facts and data not in evidence if the underlying information is the type reasonably relied upon by experts in that particular field. *Tenorio*, 2020 IL App (1st) 182608, ¶ 43. The details of the respondent's prior sexual offenses are probative of (1) the diagnosis of a mental disorder and (2) the determination that it is substantially probable that the respondent will commit further acts of sexual violence. *In re Commitment of Lingle*, 2018 IL App (4th) 170404, ¶ 54.

¶ 71    Before addressing any of the above-mentioned comments during closing arguments, the State prefaced its comments with the following:

"I know you heard lots and lots of testimony about risk assessment. It's for

you to weigh the testimony of those experts and decide whose opinion to give the

24

most weight to and what weight to give it, but I would submit to you that Dr. Stanislas [*sic*] and Dr. Louck Davis' risk assessment is the more complete picture. It is the stronger evidence.

Remember, they both talked about that fact that when you do a risk assessment you have to get the complete picture."

The State continued to discuss the actuarial data, as well as the dynamic risk factors, including deviant sexual interest. The respondent's history included prior sex offenses in his criminal history, and the experts had used this information to help form their opinions. The State also referenced the results of the respondent's PPG examination while explaining why the jury should accept Dr. Louck Davis's findings regarding the dynamic risk factors, rather than substantive evidence.

¶ 72    The State did not refer to the respondent's past sex offenses as substantive evidence; rather, the State described the reasons why the jury should credit the testimony of its experts' opinions. The State framed the facts underlying the respondent's behavioral history as a deviant pattern of behavior the experts relied upon in reaching their diagnosis. See *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 34 (the State's closing arguments were not improper where it argued the facts and circumstances of the respondent's history of violent sexual offenses as having been relied upon and completely supporting the opinions of its expert witnesses). The State's comments regarding the respondent's prior history were an accurate representation of the expert witnesses' testimony. Accordingly, as there was no basis for an objection, trial counsel's failure to object was not objectively unreasonable and did not constitute ineffective assistance of counsel.

¶ 73    Therefore, we find that the respondent has failed to establish that trial counsel's performance fell below an objective standard of reasonableness, and thus, has failed to demonstrate ineffective assistance of trial counsel.

¶ 74                                    III. CONCLUSION

¶ 75    For the foregoing reasons, the judgment of the trial court of Fayette County is affirmed.

¶ 76    Affirmed.